[Criminal No. 209. Filed January 21, 1905.]

[79 Pac. 231.]

In the Matter of the Application of the NEW YORK FOUNDLING HOSPITAL, a Corporation, for a Writ of Habeas Corpus. NEW YORK FOUNDLING HOSPITAL, Petitioner, v. WILLIAM NORTON, in the Custody of JOHN C. GATTI, Respondent.

1. INFANTS — CUSTODY — WELFARE OF CHILDREN — HABEAS CORPUS.—
Where both a corporate foundling hospital of the state of New York and residents of the territory of Arizona assert a legal right to the custody of certain children in the possession of the latter, the existence of a legal right on either side, while properly a factor to be taken into consideration in determining the welfare of the children, is not conclusive upon the court, the welfare of the children being the controlling, vital, and determinative fact.

2. SAME—SAME—SAME—SAME.—Where a corporate foundling hospital of the state of New York instituted *habeas corpus* proceedings to secure the custody of a number of children of tender years, of the Caucasian race, whom it had sent to Arizona, where its agents had placed them in the homes of poor, illiterate, and vicious half-breed Mexican Indians, from whom they were taken by American residents, the respondents, fit persons, by reason of their character, standing, and age, to have them in their custody and control, who cared for them in suitable homes, the best interests of the children are subserved by leaving them undisturbed in the custody of the respondents and dismissing the writ.

ORIGINAL PETITION for a Writ of Habeas Corpus.

Appeal dismissed for want of jurisdiction. Opinion, 203 U. S. 429, 51 L. Ed. 254.

Statement of facts:—

(105)

The New York Foundling Hospital, a corporation, filed its petition in this court, praying for a writ of *habeas corpus* to be directed to one John C. Gatti, commanding said Gatti to produce the body of William Norton, an infant, and to make return by what right he holds said infant in his possession and under his custody and control. In its application for the writ, petitioner alleged that it is a corporation organized and existing under the laws of the state of New York; that under and by virtue of its charter it is duly authorized and empowered to receive, and keep under its care, charge, custody, and management, children of the age of two years and under, found in the city of New York, abandoned or deserted, and left in the crib or other receptacle of petitioner for foundlings; that by virtue of its charter it found and received, and took under its care, charge, custody, and management, the child named in the petition; that on or about the first day of October, 1904, in the exercise of its care, charge, custody, and management of said child, it placed said child in the home of a certain person in the town of Clifton, Graham County, Arizona, to be held and cared for by said person in said home temporarily, and at all times subject to the supervision of the petitioner and its officers and agents; that on or about the second day of October, 1904, the respondent unlawfully, and by means of force and violence, took possession of said child from the person to whom it was intrusted by the petitioner, and has ever since retained possession of the same, and the said child is now in the custody and under the control of the said respondent, without the consent or license of the petitioner, and against its desire, intention, and protest.

In response to the writ issued under said petition, the respondent, as directed, produced the said child in court, and made return to the writ as follows: A motion to quash the writ was made upon the ground that the petition failed to disclose that the petitioner has any legal right to maintain the action, for the reason that the charter under which it was organized gives it no right of guardianship over the children committed to its care and custody; that its authority is limited to the reception in its institution of infants of the age of two years or under, found in the city of New York, who have been abandoned or deserted, and such as are

surrendered to it under the provisions of its charter, and to keep within said institution said infants during their minority, and that said charter does not confer upon said institution the right to make any such disposition of said children as was made by the petitioner, as set forth in its petition; and that by making such disposition the said petitioner has lost such power, right, and authority as may have been conferred upon it by the charter of the state of New York to retain the custody and control of said infant. The respondent, by way of plea in abatement, set up that the petitioner had no right to maintain the action, for the reason that it appears upon the face of the petition that the petitioner is a foreign corporation, and had not filed a copy of its articles of incorporation or charter, or the appointment of an agent resident within the territory upon whom process may be served, as provided in chapter 10 of the Revised Statutes and the amendments thereto. By way of further return, respondent alleged that letters of guardianship of the person of the child named in the petition were granted to the respondent by the probate court of Graham County, Arizona, and that said respondent, under and by virtue of said letters of guardianship, has duly qualified as such guardian by taking the oath and giving the bond required by law and the order of said court, and that thereupon respondent became, was, and now is the legally appointed and acting guardian of said child; that upon the hearing of the application for said letters of guardianship the petitioner appeared, and from the order of said court appointing respondent guardian as aforesaid it has taken an appeal to the district court of the second judicial district of the territory of Arizona. The respondent further made return that the child charged in the petition to be unlawfully in the custody and control of respondent is a white, Caucasian child, of the Anglo-Saxon race; that the petitioner on or about the first day of October, 1904, brought the said child to the territory of Arizona, and abandoned him to the keeping of a Mexican Indian, whose name is unknown to the respondent, and who was and is financially unable properly to feed, clothe, shelter, maintain, and educate said child, and is otherwise, by reason of his race, mode of living, habits, and education, entirely unfit to have such care, control, and education of said child; that the said person to whom petitioner abandoned

said child voluntarily surrendered said child to certain persons who thereupon placed said child in the care, custody, and control of respondent; that respondent is a fit person to have the care, custody, and control of said child, and that it will be to the best interest of said child that he be permitted to remain within the care, custody, and control of respondent, whose purpose and intention it is to rear, maintain, educate, and provide for said child, in all things, as though he were his own.

The motion to quash the writ was denied, and the plea in abatement was overruled. The petitioner's motion to strike was denied, and its demurrer to the return overruled.

Application for writs in sixteen other cases, involving the custody of sixteen other children, were brought by the petitioner. The petitions in those cases were similar to that filed in the case against John C. Gatti. The return in each of those cases was likewise similar to the return made in the Gatti case. In response to the writs, the children were all produced in court. By stipulation entered into between the counsel for the petitioner and the counsel for the several respondents, it was agreed that the proof adduced in the trial of the application for the writ of *habeas corpus* in the case of John C. Gatti, the pleadings, and the testimony taken, should be taken, applied to, and considered by the court as filed, taken, and applied in each of the other cases for writs of *habeas corpus* brought by the petitioner, and that each of said cases should abide the result of the determination of the case of John C. Gatti. The case was thereupon tried upon the issues of fact raised by the petition, the return, and an amended traverse to the return filed by the petitioner.

The testimony was heard in open court, before the full bench, and, in accordance with the stipulation, was permitted to embrace all the facts deemed relevant and material to all the cases before the court. The testimony and evidence show the following facts:—

The New York Foundling Hospital is a corporation organized and existing under the laws of the state of New York, for the purpose of caring for abandoned and deserted infants found in the city of New York, and such as may be voluntarily surrendered to it, of the age of two years or under; the act amending its charter providing that it should

be under the care, management, and control of the religious order known as the "Sisters of Charity." While the act amending the charter of the hospital does not in terms authorize the institution so to do, it is shown that it has been, from the organization of the hospital, the practice of its managers to place infants of suitable age in homes within and without the state of New York, to be cared for, reared, supported, and educated in such homes by the persons to whom they are given, and that it so places some four hundred and fifty children each year, and that the hospital authorities retain the right to visit such homes and to maintain a supervision over said children until they become of age. The evidence does not disclose the nature or extent of this supervision, nor the method by which it is exercised.

During the summer of 1904 the hospital authorities received a letter from a priest temporarily in charge of the parish of Clifton and Morenci, requesting that a certain number of children be sent from the institution to Clifton and Morenci, to be placed within the homes of certain of his parishioners, who were represented by said priest to be of the Spanish race, but to be persons who spoke the English language; that it was the desire of these people that only children of fair complexion be sent. In response to the application, and upon the representations made by the priest, forty children were sent by the petitioner, under the charge of Sister Anna Michella and two other sisters of charity, and an agent by the name of Swayne, consigned to the persons whose names had been previously supplied by the priest. These children were of the Caucasian race, and, as requested by the said priest, chosen from among those in the institution who were fairest and lightest in complexion. They were all children of unusual beauty and attractiveness. Their ages were from eighteen months to five years. To the clothing of each child was attached a tag, giving the band number of each child, the name of the person to whom consigned, and the name and date of birth of the child. To each person to whom a child was assigned was sent a letter, signed by the sister superior, requesting that the consignee, within a week after the reception of the child, fill out a blank which was inclosed, containing the name of the child, the name of the foster parents in full, the business occupa-

tion and the post-office address of such foster parents, and forward the same to the hospital authorities. The letter also requested that the person to whom each child was assigned should write yearly, about the 1st of May, how the child was progressing, and giving other items of interest. On the evening of October 1, 1904, the children, in charge of said sisters and agent, arrived in Clifton in a special car. It having become a matter of notoriety in Clifton that a number of children were to arrive, to be distributed to Mexican families, a crowd of Mexicans gathered at the station on the arrival of the train, together with a few American women of good families; the latter being attracted by curiosity and a desire to see the children, who, they supposed, were Mexicans. The children consigned to the persons in Clifton were taken from the car by those in charge of them, the Americans present assisting in taking them out. The latter were told by the agent that no disposition of the children to the Mexican families would be made that night, and, on being asked by one of the American women, he said that in the morning an opportunity would be given her to make an application for one of the children. Upon the arrival of the train, the priest came into the car, and Sister Anna Michella then asked him what sort of people they were to whom the children were to be allotted. He thereupon said that they were all good American citizens, moral, and had no children of their own, and that the homes were all that could be wished for. Having noticed that some of the people were not as fair in color as she had hoped for and expected, the sister asked him if there would be any half-breeds among them, and he said, ''No.'' She asked him how the people lived, and he replied that they lived in frame houses. She then stated to him that it was the rule of the home that the children were only placed out on trial until such time as the homes could be visited by the sisters, and that, if it were found that any of the homes were not as expected, the children would be removed. The children to be left at Clifton were taken to the priest's house, and fifteen of them, under the supervision of the priest, were turned over that night to the persons to whom they were consigned. No visit to or examination of the homes of these people was made at any time, either by the agent, Swayne, the sisters in charge,

or any one, on behalf of the petitioner.  They relied entirely upon the statement of the priest.

The evidence establishes, without contradiction, that the persons to whom the children were given, as assigned, both in Clifton and Morenci, were wholly unfit to be intrusted with them; that they were, with possibly one or two exceptions, of the lowest class of half-breed Mexican Indians; that they were impecunious, illiterate, unacquainted with the English language, vicious, and, in several instances, prostitutes and persons of notoriously bad character; that their homes were of the crudest sort, being for the most part built of adobe, with dirt floors and roofs; that many of them had children of their own, whom they were unable properly to support. Sister Anna Michella, who was intrusted with the matter of carrying out the instructions of the hospital authorities, was so struck by the unfitness of these people that in three instances she refused to allow the children to be delivered, and in other instances, as testified to by a witness, gave them up ''with tears streaming from her eyes''; and from her own testimony it appears·that she was not satisfied with the people to whom they were to be delivered, but that she felt that she could not override the authority of the priest.

On the morning of the 2d of October, it became generally known to the American residents of Clifton that the children had been distributed the night before to these people.  Much indignation was immediately aroused and an informal conference of citizens was held to discuss the matter of the distribution of the children which had been made.  A committee was appointed to go to Morenci and ascertain from the priest and the agent, Swayne, their purposes, and to inform them as to the feeling excited among the Americans over the distribution of these white children to these half-breed Indian families.  This committee was composed of one Jeff Dunagan, a deputy sheriff, and one Thomas Simpson.  The committee left Clifton about one o'clock in the afternoon, and arrived in Morenci shortly after two o'clock in the afternoon.  They immediately went to see Mr. Mills, the superintendent of the copper company operating at that place,—one of the leading citizens of the town,—and, in company with him, went in search of the agent, Swayne, whom they found at the hotel. Dunagan then stated to the agent the feeling which had been

aroused in Clifton, their purpose in visiting Morenci, and asked him what he would do in the matter. Both Dunagan and Simpson testified that in response to their inquiries the agent, Swayne, said that he knew his business, and did not propose to be dictated to by the people; that the children "had been placed, and would stay placed." The testimony of Swayne qualifies the statements of Dunagan and Simpson as to what was said by him on that occasion. But whatever may have been the precise reply made by Swayne, it is not disputed that Dunagan and Simpson telephoned the information to the people in Clifton that they had seen Swayne, and that his reply was that he would not do anything; that the children had been placed, and would stay placed. Upon the receipt in Clifton of this information so telephoned, a meeting of the citizens was held, and a committee of twenty-five persons was named to collect the children from the people to whom they had been consigned, and to bring them to the principal hotel of the place. The members of the committee then visited the various homes of the persons having possession of the children, and stated to the latter that they had been sent by the American residents to take the children from their possession. In each instance the children, without protest, were voluntarily surrendered, and were thereupon taken to the hotel.

Upon the arrival of the train in Clifton, all the children were neatly clad, cleanly in appearance, and gave every evidence of careful nursing and proper attention. When the children were obtained from these people, they were in a filthy condition, covered with vermin, and, with two or three exceptions, ill and nauseated from the effects of coarse Mexican beans, chilis, watermelons, and other improper food which had been fed them, and in some instances from the effects of beer and whisky that had been given them to drink. Upon the arrival of the children at the hotel, certain good women of the place took charge of them, nursed them, and secured medical care and attention for them. On the next day the children were given to the several respondents in these cases, who have since had them in their care, custody, and control.

The agent, Swayne, and the priest on the night of October 2d returned with Dunagan and Simpson to Clifton, arriving there in the early morning. Citizens to the number of two

or three hundred had assembled, and were waiting for their
return.  At this meeting much excitement was manifested, but
no act of violence was done at that or any other time.  Some
threats, however, of a general character, were made by cer-
tain persons against the agent, Swayne.  Both Swayne and
the priest made a statement of their position at this meeting.
Swayne at that time was apprehensive that he might receive
bodily harm.  In his statement at the meeting he said that
the children were placed temporarily in charge of the people
to whom they had been consigned, but the understanding was
that the sisters were to remain for a matter of two or three
weeks, and, if it were found by them that any of the children
were placed in improper homes, they would be taken from
such homes and replaced.  He protested against the taking
of the children by the American residents, and neither by his
consent, nor that of the sisters, were the children either taken
from the homes in which they had been placed or given to the
respondents.  On the next day other meetings were held, at
which both the priest and Swayne were present.  The Clifton
children were not given up to the sisters or the agent by the
people who had taken them in charge, for the reason that
they feared, if so returned, the children might be again placed
in equally unfit homes of Mexican Indians elsewhere.  In Mo-
renci, after the distribution of the children, and after the
facts had become known, the same indignation was aroused
among the American citizens, and much the same course was
pursued as in Clifton.  Mr. Mills, in company with others,
called upon the sisters and upon the agent, Swayne, and re-
monstrated with them against permitting the children to re-
main with the people to whom they had been distributed.
As a result of these remonstrances, and a statement by Mr.
Mills, that the American residents of Morenci would not
suffer the children so to remain, the priest and the agent,
Swayne, visited the homes of the Mexicans having the chil-
dren, and obtained a surrender of them, and brought them
to the hotel; and these children, with the exception of three,
who were turned over, at the request of Dunagan, to be dis-
tributed among American residents, were subsequently taken
back by the sisters and the agent to the East, and there placed
in homes.  It is shown by the testimony of Sister Anna and
the agent, Swayne, that they would not have given the three

IX Ariz.—8

Morenci children to Dunagan, except that they then believed that the people of Morenci would not permit any of the children to be taken away by them.

It is clearly established by the proof in the case, and it is not disputed, that each of the respondents is a fit and proper person to have the care, custody, and control of the children; that they are people of sufficient means properly to care for and educate the children, and that they are fit persons, by reason of their character, standing, and age, to have and maintain such care, custody, and control; that, without exception, they have become attached to the children, and the children have become attached to them; and that each desires to retain the particular child which he has, in order that he may rear the same as one of his own household.

On the 16th of October, applications were made by the respondents to the probate court of Graham County, Arizona, for letters of guardianship of the person of the child which each possessed. Hearings were had, at which this petitioner was represented by counsel, and in each instance letters of guardianship were granted in accordance with said application, and each of said respondents duly qualified as such guardian. Thereupon this petitioner took an appeal from the order granting said letters of guardianship in each case to the district court of Graham County. Pending said appeals these petitions were filed, and in response to the writs the children were brought before this court.

Eugene S. Ives, and Bennett & Williams, for Petitioner.

Bennett & Bennett, and W. C. McFarland, for Respondent.

Frederick S. Nave, U. S. Attorney, by leave of Court.

KENT, C. J. (after stating the facts as above).—This proceeding, though not presenting questions difficult of determination, or points of law that are novel, is unusual in many of its features, and is important as determinative of the disposition and welfare of a number of little children, ignorant of the contest that is being carried on in regard to them. Our decision will determine the question of their environment, the circumstances under which they shall be brought up, the foster parents and homes they are to have, and will affect their future probably to a greater degree than any one circumstance

that can now come into their lives.   The importance to them of a proper determination of this proceeding has caused us to adopt the unusual procedure of hearing the evidence orally before the full bench, and we deem it proper, although the case has only in the past few days been closed, to determine the matter now, while all the parties concerned are before the court, and to state the facts as we find them and our conclusions somewhat at length, although opportunity has not been given to formulate them other than hastily.

The question presented for our determination primarily is, What disposition of these children will be for their best interests?   They are brought before us by the petitioner, claiming its legal right to their custody.   The respondents appear and claim their custody, alleging also a legal right.   Whether a legal right exists, either on the one side or the other, such right is not conclusive upon us; and while it is properly a factor to be taken into consideration in determining the welfare of the children, such welfare is the controlling, vital determinative fact.

The supreme court of Massachusetts with that clearness of diction so frequently characteristic of its opinions, has, in the case of *Woodworth* v. *Spring,* 4 Allen, 321,—the parent case, often cited and followed,—so fully covered the law upon this subject that we deem it desirable to quote here the greater portion of that opinion.   Speaking through Mr. Chief Justice Bigelow, the court in that case said: ''The child whose custody is in controversy in this case is legally domiciled in the state of Illinois.   That was his domicile of origin, and as he has had hitherto no legal capacity to acquire a new one, and as the guardian appointed in the place of his origin has never intended to change the domicile of his ward, that of his birth still continues.   Story on Conflict of Laws, par. 46.   In determining the question of his legal custody in this commonwealth, he is therefore to be regarded as a foreign child who is lawfully within the jurisdiction of this state, having been brought within its limits not forcibly or clandestinely, but with his own consent and with that of the petitioner, his duly appointed guardian under the laws of Illinois, who had the lawful custody of his person in that state.   So much seems to be clear, and, if the right to the possession and control of the person of the child depended on his domicile, the right of the

petitioner to claim the custody of his person would be indisputable. But we are unable to see that the facts that the child was born in another state, and that he has never by an act or election of his own or of his guardian obtained a new home here, have a decisive bearing on the question at issue in the present case. He is now lawfully within the territory and under the jurisdiction of this commonwealth, and has a right to claim the protection and security which our laws afford to all persons coming within its limits, irrespective of their origin or of the place where they may be legally domiciled. Every sovereignty exercises the right of determining the *status* or condition of persons found within its jurisdiction. The laws of a foreign state cannot be permitted to intervene to affect the personal rights or privileges even of their own citizens while they are residing in the territory and within the jurisdiction of an independent government. Effect may be given by way of comity to such laws by the judicial tribunals of other states and countries, but *ex proprio vigore* they cannot have any extraterritorial force or operation. The question whether a person within the jurisdiction of a state can be removed therefrom depends not on the laws of the place whence he came or in which he may have his legal domicile, but on his rights and obligations as they are fixed and determined by the laws of the state or country in which he is found. . . . The comity of a state will give no effect to foreign laws which are inconsistent with or repugnant to its own policy, or prejudicial to the rights and interests of those who are within its jurisdiction. Even the parental relation, which is everywhere recognized, will not be deemed to carry with it any authority or control beyond that which is conferred by the laws of the country where it is exerted. The *patria potestas* of a foreign parent over his child is not that which is vested in him by the laws of the place of his domicile, but that which exists by virtue of the parental relation in the country where the father seeks to enforce his authority. These well-settled principles are founded on the necessity of securing and preserving to every state the exclusive sovereignty and jurisdiction within its own territory, and avoiding the confusion and conflict of rights and remedies which would ensue from attempting to give extraterritorial effect to the varying laws of different countries. 'Statuta suo cluduntur territorio, nec ultra terri-

torium disponunt.' Every nation has an exclusive right to
regulate persons and property within its jurisdiction accord-
ing to its own laws and the principles of public policy on
which its own government is founded.  It results from these
principles that persons exercising offices and trusts with which
they are clothed by virtue of the laws of a particular state or
country cannot undertake to transfer their power or capacity
to act, so as to control persons or property situated beyond the
limits of the jurisdiction of the government or sovereignty
from which their authority is derived.  An administrator
appointed under the laws of a foreign state cannot act as such
in this commonwealth.  Nor, for like reasons, can a guardian
appointed by virtue of the statutes of another state exercise
any authority here over the person or property of his ward.
His rights and powers are strictly local, and circumscribed
by the jurisdiction of the government which clothed him with
the office.  Story on Conflict of Laws, par. 499. . . . So far,
therefore, as the claim of the petitioner to the custody of the
child in the present case rests on a supposed rightful author-
ity to control his person in this commonwealth by virtue of his
appointment as guardian in the state of Illinois, it is not sup-
ported either on principle or authority.  He cannot assert
his tutorial power *de jure* in our courts or within our terri-
tory.  But it by no means follows that his claim to the care
of the child and the control of his person, and to the privilege
of removing him from this commonwealth, is to be absolutely
denied.  On the contrary, it is the duty of the courts of this
state, in the exercise of that comity which recognizes the laws
of other states when they are consistent with and in harmony
with our own, to consider the *status* of guardian which the
petitioner holds under the laws of another state as an impor-
tant element in determining with whom the custody of the
child is to continue.  It would not do to say that a foreign
guardian has no claim to the care or control of the person of
his ward in this commonwealth.  If such were the rule, a child
domiciled out of the state, who was sent hither for purposes
of education, or came within the state by stealth, or was
brought here by force or fraud, might be emancipated from
the control of his rightful guardian, duly appointed in the
place of his domicile, and thus escape or be taken out of all
legitimate care and custody.  But in such cases the foreign

guardian would not be regarded here as a stranger or intruder. His appointment in another state as guardian of an infant, with powers and duties similar to those which are by our laws vested in guardians over the persons of their wards, would entitle him to ask that the comity of friendly states having similar laws and usages should be so far recognized and exerted as to surrender to him the infant, so that he might be again restored to his full rights and powers over him, by removing him to the place of his domicile. And if it should appear that such surrender and restoration would not debar the infant from any personal rights or privileges to which he might be entitled under our laws, and would be conducive to his welfare and promote his interests, it would be the duty of the court to award to the foreign guardian the custody of the person. Nor can we see that the appointment of a guardian over the minor by the probate court in this commonwealth operates to bar any decree by this court in favor of the foreign guardian, awarding to him the custody of his ward. Such an appointment might be expedient and proper for the purpose of clothing some one in this commonwealth with authority over the person of an infant for his protection and security against any unauthorized interference or control. But it certainly would not conclusively settle his permanent *status* or condition, so long as he remained an infant, or prevent his being removed from the commonwealth by the guardian appointed in the place of his domicile, if the interests and welfare of the ward rendered such removal expedient or necessary. No doubt, so long as the child continues within this jurisdiction, the guardian appointed in the courts of this state would have the exclusive right to the custody of his person. But the decree of the probate court does not deprive this court of the power to adjudicate and determine the question of the proper custody of the child as between a domestic guardian and one appointed in the place of the domicile of the infant. The jurisdiction of this court to decide, on *habeas corpus* or other proper process, concerning the care and custody of infants, is paramount, and cannot be taken away by any decree of an inferior tribunal. . . . The result is that neither of the parties to the present proceeding can assert or maintain an absolute right to the permanent care and custody of the infant who is now before the court. But

it is for this court to determine, in the exercise of a sound judicial discretion, having regard to the welfare and permanent good of the child, as a predominant consideration, to whose custody he shall be committed.''

It will be noted that the case from which we have quoted differs from the proceeding before us, in that in the Massachusetts case the child was in that jurisdiction without the intent of its guardian to change its domicile to that state, while here the still stronger reason exists for following the doctrine enunciated, in that the petitioner, in the exercise of its custody and control over the children, voluntarily brought them to this jurisdiction, with the conceded intention of changing their domicile by placing them in the homes in this territory it then believed to be suitable ones. Following the law as we find it—and with it we are in full accord—we do not deem it important to the main issue to be decided to pass upon the contention of the respondents that the charter of the petitioner gives it no right either to place these children in homes, or to reclaim them for any cause after they have been so placed; that the petitioner has no rights of guardianship; that whatever rights the petitioner has have no extraterritorial force, and can avail such institution nothing outside the state of New York; that if the petitioner has a right to place such children in homes, then admittedly it is a part of its business, and, in placing these children in the homes here, it has been carrying on such business in this territory, and, having done so without complying with the territorial laws respecting the filing of its articles and the appointment of an agent, it cannot now, under our law, maintain this proceeding, founded on such business so done here. If the subject-matter of this proceeding were other than that of the custody of children, the legal propositions advanced by the respondents would merit careful attention; but in this proceeding it is sufficient to say that we do not recognize any of them as a bar to the proceeding brought by the petitioner, and that we recognize its right to present this application, and the power of the court under this application to award the petitioner the relief it seeks, if it be for the best interests of the children so to do. Similarly, it is not necessary for us to determine whether the petitioner is correct in its position that the letters of guardianship issued to the respondents by the

probate court of Graham County give the respondents no legal right to the custody of the children, for the reason that, an appeal having been taken to the district court, where a trial *de novo* must be had, such appeal vacates the order of appointment and the letters issued thereunder, for, if the letters be valid, and the respondents the appointed guardians thereunder, such fact is in no way controlling upon us, and is but one of the surrounding circumstances at which we should look in the interests of the children.

We hold, therefore, that, under the facts as we find them, neither the petitioner nor the respondents have any such legal claim as authorizes us for that reason to award to either of the parties the care and custody of these children. We have, then, to decide what disposition must be made of the children, to subserve best their welfare. The petitioner has frankly conceded that a great blunder was committed in the consignment and delivery of the children to these degraded half-breed Indians. The evidence satisfies us that it was an unintentional blunder on the part of the institution, and was caused by the misleading and inaccurate report of the local priest, who was not connected with the institution, and was a foreigner and unacquainted with existing conditions; that such blunder was not remedied at the time because of the tactless stubbornness of the agent, and the feeling of the sister in charge that she must bow to the authority of the priest, who insisted upon such disposition. We recognize the desire of the institution to right now, and to right itself, the wrong done these children, and to secure for them now suitable homes to be chosen by it, and, with the record of its great service to humanity in the past, we have no doubt of its purpose and ability to do so; but as, in the full light of the history of this transaction, shown by the evidence adduced at the trial, of which the institution so far away can hitherto have had but partial knowledge, it appears that the mistake, as originally made, was made by one not connected with the petitioner, and that the ultimate purpose of the institution— that of finding suitable homes for their children—has in this instance already been accomplished, we do not believe that the best interests of these children will be promoted by allowing the petitioner to adopt the course which it desires.

The counsel for petitioner has eloquently argued to us that

the interests of these children will best be subserved by allowing this institution to take them to the East, and there place them in homes far removed from the knowledge of their antecedents, which by reason of the recent events has become so general where the respondents live. This argument would have great weight if we could be led to believe that a mere change of foster parentage would insure a condition of ignorance of the circumstances of their birth and desertion, either in the children when they come to years of discretion, or in the friends and families of their adoption. There can be, at most, but a chance that such would be the result. As it is, these present foster parents—persons of some means and education —from the day when with humanitarian impulse, and actuated by motives of sympathy for their pitiful condition, they assisted in the rescue of these little children from the evil into which they had fallen, down to the time of their attendance at this trial, at cost of much time and money, in their loving care and attention, have shown that more than ordinary ties of affection bind them to these children, and that in no other homes that can be found for them are they so likely to fare as well. We feel that it is for their best interests that no change be made in their custody, and that, if anywhere, here in the changing West, the land of opportunity and hope, these children, as they grow to manhood and womanhood, will have the fullest opportunity that it is possible for them to have to be judged, not upon the unfortunate condition of birth, but upon the record they themselves shall make, and the character they shall develop.

The writ will be dismissed in this and the other cases.

SLOAN, J., DOAN, J., and DAVIS, J., concur.