[Civil No. 3857. Filed January 31, 1938.]

[75 Pac. (2d) 685.]

ELIZABETH EDWARDS FLADUNG, Appellant, v. RUSSELL V. SANFORD and LORETTA V. SANFORD, His Wife, Appellees.

Messrs. Robles & Dodd and Mr. Clarence E. Houston, for Appellant.

Mr. John L. Van Buskirk and Mr. O. E. Glover, for Appellees.

LOCKWOOD, J.—Elizabeth Edwards Fladung, hereinafter called petitioner, filed her application for a writ of *habeas corpus* in the superior court of Pima

county, alleging that she was the mother of a certain infant child named Russell Samuel Edwards, who was unlawfully detained by Russell V. Sanford, hereinafter called respondent, and asking that the child be delivered to her. The writ was issued and the matter came on for hearing before the superior court. Therein the following undisputed facts developed:

The child involved in the controversy was born out of wedlock, petitioner being his mother and Russell V. Sanford being his father. For some reason, Sanford desired to legitimize the child under the provisions of section 126, Revised Code 1928, which reads as follows:

*"Adoption by father of child born out of wedlock by acknowledgment.* The father of a child born out of wedlock, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if born in wedlock, thereby adopts it as such; and such child is thereupon deemed for all purposes, born in wedlock from the time of its birth. The foregoing provisions of this chapter do not apply to such an adoption."

He therefore went to the city of Albuquerque and asked the mother for permission to adopt the child, which was refused. He finally, however, secured possession of the child from the mother, the latter executing the following document:

"I, Elizabeth Fladung, sometimes known as Elizabeth Edwards, do hereby consent that the care, custody and control of my son Russell Samuel, age nine months, be placed exclusively in Russell V. Sanford and his wife, Loretta Sanford, until the first day of July, 1934. Elizabeth Fladung Edwards,"

and promised to return him on July 1, 1934. He immediately took the child to Tucson, received him into his home, with the consent of Loretta V. Sanford, who was and at all times referred to herein had been his

wife, and publicly acknowledged it as his own child, treating it in all manners as though born in wedlock.

Some time thereafter, petitioner endeavored to regain possession of the child, and was informed that respondent had adopted it under section 126, *supra,* whereupon she filed this petition in *habeas corpus.* The trial court made an order granting her temporary access to the child at all reasonable times, but when the matter came on for final hearing, the writ was discharged, whereupon this appeal was taken.

█ █ The situation presented by the facts in this case is unique so far as this state is concerned, and raises many novel and interesting questions of law. The right of *habeas corpus* was originally granted solely in cases of arrest and forcible imprisonment under color or claim of warrant of law, but its use was gradually extended until now it is frequently used to determine the question of which of two parents is entitled to the custody of their children. This jurisdiction is exercised by the state as *parens patriae,* and it is a settled doctrine that in such cases the court exercises its discretion in the interests of the child, basing its decision upon what care and custody is the best fitted for it in view of its age and requirements. *New York Foundling Hospital* v. *Gatti,* 203 U. S. 429, 434, 27 Sup. Ct. 53, 51 L. Ed. 254; Id., 9 Ariz. 105, 79 Pac. 231, 7 L. R. A. (N. S.) 306.

It is the contention of petitioner: (a) That the mother of an illegitimate child is entitled, as of right, to the custody of such child as against the whole world, and that the father cannot legitimize it as against the mother's consent so as to deprive her of its custody; and (b) that even so the child has been so legitimized by the father, the mother is still entitled to visit it and have it visit her, and enjoy its society under all reasonable circumstances.

■ Under the common law it was the rule that the mother of an illegitimate child was entitled to its custody as against the entire world, and there was no method of legitimizing it. This rule, however, has been modified by statutes, most states adopting the more humane rule of the civil law that the subsequent intermarriage of the parents, accompanied by an acknowledgment of paternity upon the part of the father, legitimized previous issue, and when so legitimized the child was no longer considered as illegitimate for any purpose. This statute, however, obviously did not entirely protect innocent children of illicit relations, for it was only the subsequent marriage of the parents which legitimized them. Many of the states eventually, therefore, went further toward protecting the children, among them being Arizona, and section 126, *supra,* appeared in the Revised Statutes of 1901 as paragraph 2045, being subsequently carried into the Codes of 1913 and 1928. Even this, however, was not deemed sufficient, and our legislature enacted chapter 114 of the Session Laws of 1921, which was carried forward into the Revised Code of 1928. Section 273 of that Code reads as follows:

*"All children declared legitimate.* Every child is the legitimate child of its natural parents and is entitled to support and education as if born in lawful wedlock, except the right to dwelling or a residence with the family of its father, if such father be married. It shall inherit from its natural parents and from their kindred heir, lineal and collateral, in the same manner as children born in lawful wedlock. This section shall apply to cases where the natural father of any such child is married to one other than the mother of said child, as well as where he is single."

By virtue of this last-quoted section all children born out of lawful wedlock, as well as those born in such state, were declared legitimate and entitled to the right of support, education, and inheritance from both

their parents. They were, however, denied the right of residence with the family of the father if he were married, and a special procedure by the mother was required to establish the paternity of the child. Section 274, Rev. Code 1928. Under our law as it existed at the time of this action, two methods of establishing the paternity of children born out of wedlock, therefore, existed, (1) an action by the mother under the provisions of section 274, *supra*, and (2) an extra-judicial proceeding by the father under section 126, *supra*. It is a proceeding of the latter nature which is involved in the present action.

So far as we are aware there is but one case where the question of the right of a father to legitimize a child as against the wish and consent of the mother has been before the appellate courts of this country, and that is the one of *Allison* v. *Bryan*, 21 Okl. 557, 97 Pac. 282, 286, 17 Ann. Cas. 468, 18 L. R. A. (N. S.) 931. The Oklahoma statute on this subject is almost *verbatim* that of Arizona, and it is evident that our statute was either taken from Oklahoma, or that they both are derived from a common source. In that case the court held that a child might be legitimized under the statute without the consent of the mother, or even against her active opposition, and its reasons for so holding are so cogent, and, in our opinion, conclusive, that we quote them somewhat at length:

"A child is primarily a ward of the state. The sovereign has the inherent power to legislate for its welfare, and to place it with either parent at will, or take it from both parents and to place it elsewhere. This is true not only of illegitimate children, but it is also true of legitimate children. The rights of the parent in his child are just such rights as the law gives him; no more, no less. His duties toward his child are just such as the law places upon him. . . . 'In return for the discharge of those duties, and to aid in their performance, the law confers on the father a qualified right to the services of the child. . . . But,

whatever may be their value, the domestic relations and the relative rights of parent and child are all under the control and regulation of the municipal laws. They may and must declare how far the rights and control of the parent shall extend over the child, how they shall be exercised, and where they shall terminate.' . . . 'In *Mercein* v. *People,* 25 Wend. [(N. Y.) 64] 99, 35 Am. Dec. 653, it was said: "There is no parental authority independent of the supreme power of the state. But the former is derived altogether from the latter. The moment a child is born it owes allegiance to the government of the country of its birth, and is entitled to the protection of that government. And such government is obligated, by its duty of protection, to consult the welfare, comfort, and interest of such child, in regulating its custody during the period of its minority." The American rule is thus tersely summed up by an American text-writer on the subject:

" 'It may be considered as the settled doctrine in American courts that all power and authority over infants are a mere delegated function, intrusted by the sovereign state to the individual parent or guardian, revocable by the state through its tribunals, and to be at all times exercised in subordination to the paramount and overruling direction of the state. Hoch. Inf. p. 16.'

"So the sovereignty which had the power to say that the mother of an illegitimate, unmarried, minor child is entitled to its custody, services, and earnings had an equal power to place a limitation upon such right; and in this case one of such limitations is contained in the section under which the father acted. But the rights of such father are not absolute; they in their turn are limited by other sections of the statute, among which may be mentioned section 9, art. 1, c. 59 (section 3768), Wilson's Rev. & Anno. Stat. 1903, which provides: 'The abuse of parental authority is the subject of judicial cognizance in a civil action in the district court brought by the child, or by its relatives within the third degree or by the officers of the poor where the child resides; and when the abuse is established, the child may be freed from the dominion

of the parent, and the duty of support and education enforced.' From all of which may be seen, growing stronger with the years, a tender solicitude for the welfare of the child. The child in this case is innocent of any of the wayward acts of its parents, and it is their highest and most imperative duty toward it to see to it that it does not suffer therefrom. That they may not be able to shield it entirely is possible, but they compound their sin to the extent that they can and do not. . . .

"If this were a question to be determined by the measure of which, the father or the mother, loved most deeply, or which of them would be willing and glad to do most for the child, we would unhesitatingly yield, as did the learned judge, to the mother, but this is not a question as between the love of the father or the mother, nor between them and their offspring, but primarily between this child and the world which he must confront and face in making its way along life's highway. . . . Literature contains no panegyrics to the patient, plodding, hard-working duty-bound father, and we will not indulge in any here, but no boy who has grown to manhood's estate, and had a good, honest, honorable, upright father to direct his course, can fail to recognize and know what a valuable asset to him that father's good name was; what a shield that father's family became. . . . We would not have it understood, however, that in thus declaring the law we hold he should not see his mother, be with her, or be permitted to enjoy her society, nor she his. Not at all. Under the judgment rendered in this cause in the lower court provision was made for the father to visit the child, and the successful respondents should not be deaf to those common promptings of humanity which dictate that the child and the mother be granted the utmost possible latitude for social communion consistent with the new duties placed upon all. In case of sickness or accident the mother should be promptly notified, and, if she desires, permitted to attend, care for, and nurse. The treatment to be accorded the child is that usually accorded legitimate children. Such children are frequently permitted to go from home to visit their

friends and kindred, and friends and kindred are fre-quently permitted to visit them, and this is the treatment that the father, in this instance and in this case, should accord to this child, and which should now establish its relationship toward its mother.''

We can add nothing to the reasoning thus set forth, and approve heartily of the principle laid down therein. We hold, therefore, that under the law of Arizona, the father of a child born out of wedlock may act under the provisions of section 126, *supra,* without the consent of the mother, and that when he has so acted, the child becomes for all purposes his legitimate child in the same manner as though he and the mother had been united in wedlock at the time of its birth.

But when the future custody of the child is concerned, the same principle should be applied as is applied to the custody of children born in wedlock whose parents unfortunately are separated and are contesting with each other the right to the custody of the child. The trial court finally determined that the writ of *habeas corpus* should be quashed. We have examined the transcript of evidence carefully, and it is apparent therefrom that the question of the competency of the respective parties to care properly for the child was not in dispute. The matter was fought out and determined solely upon the issue of whether the father had a right to proceed with the adoption of the child under section 126, *supra,* against the consent of the mother. We have held that he did have this right, and the mother was, therefore, not entitled, *as a matter of right,* to the custody of the child. Its future custody was a question to be determined by the court upon a hearing as to what the best interests of the child required. We must assume, since it quashed the writ, that it concluded that under the existing circumstances there was no reason for taking the child

away from the custody of the father, and we cannot say that its discretion was abused. We think, however, that such an order is not conclusive for the future, and that the mother may at any time she is so advised renew her petition, the issue then being as to in whose custody the child's welfare will be best served, and the trial court on such renewed petition will have the same right to make such order as may seem proper under the evidence, as it would in a similar contest between the parents of children born in wedlock.

The order appealed from is affirmed.

McALISTER, C. J., and ROSS, J., concur.