406 P.2d 852

Frank G. CARUSO, Petitioner,

v.

SUPERIOR COURT of the State of Arizona
IN AND FOR the COUNTY OF PIMA,
Father Ryle and the Catholic Social Serv-
ice, Tucson, Arizona, Respondents.

No. 2 CA–CIV 137.

Court of Appeals of Arizona.

Oct. 18, 1965.

Rehearing Denied Nov. 3, 1965.

Healy, Laubscher & Dickerson, by F. Dale Healy, Tucson, for petitioner.

Darrell F. Smith, Atty. Gen., by Philip M. Haggerty, Asst. Atty. Gen., Phoenix, for respondents State of Arizona and Pima County.

Murphy & Vinson, by John U. Vinson, Tucson, for respondent Catholic Social Service.

MOLLOY, Judge.

This decision arises out of a petition for writ of prohibition as to the Superior Court of the State of Arizona, sitting in Pima County, to restrain such court from taking any further action in a proceeding pending in the juvenile court of such county, said proceeding being designated by the number DEP–16414 in that county. The juvenile proceeding with which we are concerned arises out of a petition to declare a certain newborn child a dependent child, which petition resulted in a hearing on July 8, 1965, before the juvenile court, at the conclusion of which hearing the court adjudicated that the child was dependent and determined that a further hearing should be conducted on July 14, 1965 to determine whether the parental rights of the natural father of the child should be terminated so that the child might be placed for adoption.

The child concerned was born out of wedlock to a 17 year old girl in May of 1965. The natural mother relinquished the child for adoption to The Catholic Social Service, a licensed child placement agency, in pursuance of A.R.S. § 8–512, subsec. B. The petitioner herein, who contends that he is the natural father of this child, has acknowledged parentage

of the child by recording in the office of the state bureau of vital statistics a notarized certificate of parental acknowledgment, as contemplated by A.R.S. § 8–103.

The petitioner takes the position that as the natural father he is entitled to the custody of this infant against all other persons except the natural mother and that she having relinquished the child, he is entitled to its custody against the world. The petitioner relies upon what appears to be the weight of authority under the common law and in the absence of statute. 10 Am.Jur.2d Bastards § 62, p. 890; 10 C.J.S. Bastards § 17 c, p. 84; 37 A.L.R.2d 882.

Upon learning of the claims of the putative father, The Catholic Social Service filed a petition with the juvenile court alleging that the child was dependent under applicable law and praying that the juvenile court take jurisdiction of the child and make such orders regarding the care and custody of such child as the court might deem just and proper. At the hearing before the juvenile court the petitioner appeared with counsel to resist the petition. Evidence at the hearing established that the petitioner was graduated from high school in June of 1964. During the summer of 1964 he and the mother of the child were together "nearly constantly," attending picnics and other social events. He testified that he had sexual intercourse with her during the summer, that she subsequently informed him that she was expecting a child which was his, that he had tendered to The Catholic Social Service the sum of $175.00 for the lying-in expenses of the mother, which tender had been refused, that as of the date of the hearing he had been steadily employed since October of 1964, and that he was ready, willing and able to care for the newborn infant. The petitioner further testified that he had asked the mother of the child many times to marry him, which she had refused to do, and that now he believed there was no possibility of such a marriage.

The petitioner's mother appeared at the hearing and from her it was established that the petitioner was one of five children in this family, three of whom, including the petitioner, were still living in the home. She testified that she would be willing to assist her son in caring for the child in question but that neither she nor her husband wished to take the primary responsibility for the raising of the child. The exact extent of the care to which these putative grandparents might contribute was never definitely established at the hearing, nor was it indicated that either was willing to give up full-time employment out of the home in order to contribute to the daily needs of the infant child under consideration.

The petitioner's plan for the care of the child as presented to the juvenile court was that petitioner would live at home with his parents for the first couple of weeks and then would get an apartment of his own where the child would be cared for by baby-sitters employed by the petitioner. The petitioner's mother testified that the petitioner had made considerable progress in recent months toward becoming a stable person.

The petition for prohibition is sought upon two legal grounds:

1. That there was not sufficient evidence before the juvenile court to warrant an adjudication of dependency upon the part of the subject infant and that therefore the court lacked jurisdiction to proceed further with any hearings to determine whether the parental rights of the petitioner should be terminated.

2. That a juvenile court has no jurisdiction to sever the parental rights of any parent, that such a proceeding is an avoidance of the adoption laws of this state, and that therefore the proposed hearing, which was scheduled for July 15, 1965, was beyond the jurisdiction of the juvenile court.

Petitioner's contention that there was not sufficient evidence for an adjudication of dependency is met, on the part of the respondents, by the assertion that even though

the juvenile court might have been in error in adjudicating the subject minor to be a dependent child, such error is not one affecting the jurisdiction of the court and that therefore the alternative writ of prohibition heretofore issued by this court should be quashed. Reliance is placed by the respondents upon decisions of our Supreme Court holding that a writ of prohibition cannot be used for the purpose of correcting errors made by a lower court, among such decisions being the cases of State v. Phelps, 67 Ariz. 215, 193 P.2d 921 (1948) and Loftus v. Russell, 69 Ariz. 245, 212 P.2d 91 (1949). The respondents take the position that the proper remedy of the petitioner, if any, is by appeal.

■ This court has ruled in Ginn v. Superior Court, 1 Ariz.App. 455, 404 P.2d 721 (1965), that there is no appeal from a decision of a juvenile court. If this be the law, then there is certainly a special reason for looking with favor upon a special writ to review the proceedings of a juvenile court. Time is always of the essence in matters relating to the custody of children, and this is particularly so in the case of the newborn infant. This court takes judicial notice of the fact that generally, an infant's opportunity to be placed for adoption is greatest when it is newborn and that the probabilities of a favorable placement decrease proportionately as the child grows older. Months and perhaps even weeks make substantial differences in the placement possibilities of a child where adoption is being considered.

■ Since the Phelps and Loftus decisions our Supreme Court has taken a broader view of the function of special writs. Lesher, Extraordinary Writs in the Appellate Courts of Arizona, 7 Ariz.L.Rev. 34. Accordingly, irrespective of whether there is a right to appeal from a decision of the juvenile court, this court holds that the question of whether there was substantial evidence to support a finding by the juvenile court of dependency on the part of a child is a question that may be raised by a special writ, such as certiorari or pro-

hibition, whichever may be appropriate. It has been held that lack of substantial evidence to support a finding of neglect deprives a juvenile court of jurisdiction. State ex rel. Mattes v. Juvenile Court of Ramsey County, 147 Minn. 222, 179 N.W. 1006 (1920); Kennison v. Lee, 217 Ga. 155, 121 S.E.2d 821 (1961); In re Shady, 264 Minn. 222, 118 N.W.2d 449 (1962).

■ The respondents have asked this court to consider the written materials submitted to the court by The Catholic Social Service in connection with the hearing held on the petition that this child be adjudicated a dependent. This court does not believe it is proper to consider such material in order to establish the jurisdiction of the juvenile court. Annotations, 86 A.L.R. 1008 and 43 A.L.R.2d 1128; 31 Am.Jur. Juvenile Courts and Delinquent, Dependent, and Neglected Children §§ 75–77. This material was not provided to the petitioner or his counsel nor were they given an opportunity to cross-examine the social worker who prepared these reports. Under these circumstances this court cannot countenance the use of these statements by the court to establish the facts necessary for its own jurisdiction. We are therefore relegated to the record of the testimony taken at the hearing, the transcript of which has been filed with this court in response to the alternative writ issued.

■ A writ of prohibition should only be used when a judicial body is about to take some action which is beyond its jurisdiction and should not be used to correct a past excessive exercise of jurisdiction. Jacobson v. Superior Court, 1 Ariz. App. 342, 402 P.2d 1018. In this case, the action proposed to be taken by the lower court is a hearing to determine whether parental rights should be severed as to the petitioner. We believe that the petition for writ of prohibition procedurally presents two questions to this court:

1. Was there sufficient evidence before the juvenile court from which the finding of dependency could rightfully be made as to this child?

2. Does a juvenile court have the right to sever parental rights as to children within its jurisdiction so as to place a child for adoption in such manner that the parents whose parental rights have been severed need not be given notice in the adoption proceedings?

The first question leads us directly to our statutes, which define and limit the jurisdiction of the juvenile court and specify the types of children over which this special court shall have jurisdiction. In A.R.S. § 8–201, subsec. 5 we have the statutory definition of a dependent child:

"'Dependent child' includes a child who is homeless or destitute, or without proper support or care through no fault of his parent or guardian, and a child who lacks proper care by reason of the mental or physical condition of his parent, guardian or custodian."

A comparison of the laws of various jurisdictions in this country indicates that there is no uniformity as to the definitions of the various categories of children as to which a juvenile court will have jurisdiction. A "dependent" child in one state may very well be a "neglected" child in another and vice versa. One finds the general statement in 31 Am.Jur. Juvenile Courts § 37, p. 316:

"The term 'neglected child' is broader than the term 'dependent child.'"

■ The foregoing generalization is obviously not pertinent to the statutory law of Arizona, as it is apparent from reading A.R.S. § 8–201 in its entirety that the terms "neglected child" and "dependent child" are mutually exclusive, the former term being generally applicable to situations where the child's care is not proper because of some fault of its parents or guardian, while the latter term applies to a situation where the lack of proper care is " * * * through no fault of his parent or guardian, * * *." In seeking assistance, however, from periodicals or from the decisions of other states, it must be remembered that a broad problem of the lack of proper care of children, whether through the fault of the

parent or not, is often considered under what is usually the more encompassing label of "neglect." Young, The Problem of Neglect—The Legal Aspects, 4 J. Family L. 29; Gill, The Legal Nature of Neglect, 6 NPPA J., No. 1, Jan. 1960, p. 1.

Under the statutory definition quoted above, and under the evidence presented to the juvenile court, here we can be concerned only with the question of whether there was sufficient evidence to establish that at the time of the hearing before the court this particular child lacked " * * * proper care by reason of the mental or physical condition of his parent, guardian or custodian."

■ If "proper care" means food and clothing, and these alone, the only conceivable answer to the question before the court is a firm negative, denying the jurisdiction of the juvenile court. We do not, however, believe that this statute should be so strictly construed. The following general statements have been somewhat persuasive to this court in arriving at the opposite view:

"The statutes usually define what is meant by a neglected or dependent child. Such statutes should be liberally construed, to aid the purpose of their enactment. Whether a child is a 'neglected child' within the meaning of the statute is a question of fact."

"No cut-and-dried rule can be laid down to serve as a yardstick for the determination of where the neglect of a child begins and where it ends, where it harms and where it does not harm. Each case involving neglected children must be determined on the facts as they are developed. The question involved with respect to a neglected or dependent child is, theoretically at least, one of food, clothing, a home, healthy surroundings, and proper parental care, and not crime." 31 Am.Jur. Juvenile Courts § 37, pp. 315–316.

■ While behavioral sciences are admittedly unable to be as definitive as the physical or biological sciences, a substantial

body of sound knowledge has been developed in this field, particularly in the area of the emotional needs of infants and children. When knowledge is sufficiently well-established that it finds its way into encyclopedias of general use, it is not remiss for a court to take cognizance of it. Udall, Arizona Law of Evidence § 201. Encyclopedia Americana, International Edition (1965) commences its article on "Infancy and Infant Care" with this:

"The human being from birth to about 12 months has received more and more study and attention in the past several decades. No other period of history has witnessed such great advances in research on how children grow and develop as has the last half-century. And increasing emphasis has been placed on the effect of what the individual experiences in infancy. The physical, mental, emotional, and social aspects of a child's life are coming to be seen as constantly interwoven, although we still speak of them separately.

"The infant who not so long ago was generally looked on as a 'lovable bundle,' with no particular ability to feel or think or react, is recognized today as a very impressionable being indeed. The newborn—weighing an average of about 7½ pounds, measuring about 20 inches in length (individual babies range from 'very small' to 'very large,' and all are normal), often with too much or no hair, eyes that 'float,' an overlarge head and stomach, and sometimes a mottled, reddish skin—may appear as something less than human and remarkably helpless. But he can cry, he can feel warm or cold, he can smell and taste, he can cough and sneeze, he can sense hunger pangs and the need to suck. Above all, he can feel loved or not. The skin of the newborn seems to be especially sensitive and he responds to contact, patting, and caressing. He senses whether he is being held snugly and firmly, or distantly and awkwardly. So the impulses parents

feel to cuddle and protect the infant, to handle him gently, fit in precisely with his needs. Scientific study has shown that infancy passed in such a loving, warmly dependable environment has the best chance of resulting in secure, outgoing, and confident adulthood." (Vol. 15, p. 104)

■ This court holds that this body of knowledge is sufficiently well-established that a juvenile court, and this court on appeal, can take judicial notice of the fact that there are emotional needs of infants the satisfaction of which are equally as demanding as the physical hungers of the child and that the failure to satisfy these needs may result in more permanent damage than temporary physical neglect.

At a time in the development of our society characterized by an increase in crime, both juvenile and adult, and of emotional disturbance, it seems appropriate that a juvenile court, which has a primary and constitutional responsibility (Art. 6, § 15, Arizona Constitution, A.R.S.) in the matter of dependent, neglected, incorrigible and delinquent children, should be given the power to deal with the causes of such maladjustments. Such we believe is the situation here.

Though by statutory law we have "legitimatized" all children (A.R.S. § 14–206), there still is in our society, in connection with the child born out of wedlock, some stigma that is conducive to emotional problems in the child. This is part of the "home" offered to this child by its putative father. It has been held that illegitimacy of itself is not "dependency" within the statute authorizing a juvenile court to terminate all rights of parents on determination of neglect or "dependency." In re Shady, 264 Minn. 222, 118 N.W.2d 449 (1962). But this does not mean that a court concerned with the welfare of children should divorce itself entirely from consideration of this aspect of a child's environment. This is not the ordinary case of a mother claiming a child which she has painfully borne, but a father claiming

privileges against the considered wish of a mother for her child.

And the age of this particular father is a matter which the juvenile court had the duty to consider. The average 19 year old young man of our present-day society is usually not of the type to provide for the emotional needs of a newborn infant, either by himself or through "baby-sitters."

 This court believes that in this area of our law, where the lives of infants are to be profoundly affected by judicial decisions, there is more danger of being rigid in one's thinking than when property rights are being adjudicated. If one views the petitioner's "rights" as to the subject child to be in the category of property rights, then the decision of the juvenile court is indefensible. But this court holds that our society has progressed and developed beyond the proprietary view of parental rights. The petitioner has no chattel ownership in this child. He is, presumably, the natural father of the child and as such is entitled to be heard sympathetically by the court. But sympathy for the father should not outrank nor in any way obscure the court's concern for the infant whose welfare should be the paramount consideration of the court at all times. Dickason v. Sturdavan, 50 Ariz. 382, 387, 72 P.2d 584 (1937); Henning v. Henning, 89 Ariz. 330, 334, 362 P.2d 124 (1961).

All attendant circumstances must be considered and the problem at hand carefully evaluated. This court subscribes to the following general statement:

"* * * so that the facts will have to show a much different situation of neglect to justify a permanent separation of child and parent than to justify a temporary removal of the child from the home; or to justify the separation of a newborn illegitimate child from its sole parent than the taking of a school-age child from its family." Young,

The Problem of Neglect—The Legal Aspects, 4 J. Family L. 29, 31.

There is one other factor which tends to bring this child's situation within the periphery of the juvenile court's jurisdiction. The statute under which this child was relinquished to the adoption agency by the natural mother, A.R.S. § 8–512, subsec. B, provides, in part:

"The parents or the surviving parent of a child, or *the mother of a child born out of wedlock*, may relinquish the child to a child welfare agency licensed to place children for adoption * * *." (Emphasis added.)

 The statute does not make any exception to the rights of the unwed mother to relinquish her child for adoption in the case where the natural father acknowledges his parentage or had the same established by judicial proceeding. Whatever be the rights under the common law,[1] of a father of a child born out of wedlock, such rights are certainly subject to modification by the state legislative body. Fladung v. Sanford, 51 Ariz. 211, 75 P.2d 685 (1938).

The juvenile court was thus presented with the fact, in addition to other matters affecting the welfare of this child, of controversy over the right to its custody between a child welfare agency to which the child's natural mother had rightfully relinquished custody and the putative father asserting his rights under ancient law. The aspect of controversy was an integral part of the environmental situation of the infant. Though this situation alone could not be decisive, this court believes that the juvenile court rightfully took it into consideration somewhat in reaching its decision.

 Accordingly, this court holds that sufficient facts were established in the juvenile court to support a determination by the juvenile court that this infant lacked proper care from its natural parents and

[1] And the matter is not without substantial conflict, there being substantial and modern authority to the effect that such a father has no rights whatsoever: Gordy v. Dunwoody, 210 Ga. 810, 83 S.E.2d 7 (1954); Thomas v. Children's Aid Society of Ogden, 12 Utah 2d 235, 364 P.2d 1029 (1961); Cleaver v. Johnson, 212 S.W.2d 197 (Tex.Civ.App. 1948).

that its best interests required the assertion of jurisdiction over it by the juvenile court.

We proceed to the question of whether a juvenile court may sever or terminate parental rights over a dependent child within its jurisdiction, so as to obviate the necessity of giving notice to such parent of any later adoption proceedings that might occur.

The power of the court to so do is vigorously attacked by the petitioner who contends that any such authority would be a circumvention of the adoption laws of this state. The court's attention is called to the provisions of A.R.S. § 8–103, subsec. A and that part thereof which reads:

"Before the court may enter an order for the adoption of a minor, the provisions of this section which are applicable to the proceeding shall be observed:

"1. Consent to the adoption shall be obtained from the individuals or agencies found capable of giving consent under the following circumstances:

\* \* \* \* \* \*

"(b) The mother only of a child born out of wedlock, but the consent of the father of a child born out of wedlock shall be required if the father has acknowledged his parentage, either by subsequent marriage to the mother, or by recording in the office of the state bureau of vital statistics prior to the filing of the petition for adoption a notarized certificate of parental acknowledgment as to the child. Consent of the father shall be required if his parentage has been established through proceedings instituted under the provisions of articles 3 or 4, chapter 6, title 12, or article 3, chapter 7, title 12."

Considered alone, the quoted subsection lends support to the petitioner's contention. However, subdivision (b) must be read in conjunction with all other subdivisions. Subdivision (e) of A.R.S. § 8–103, subsec. A reads as follows:

"A public or private child welfare agency licensed under the provisions of chapter 5 of this title to place children for adoption, and vested with authority to consent to the adoption of the child concerned either by written relinquishment of parental rights to the agency *executed by the parents or parent whose rights have not been divested in a lawful manner, or an order of court committing the child to the care and custody of such agency*, or with the written consent of the court in the case of a foundling child whose parents are not known or cannot be found." (Emphasis added.)

Reading A.R.S. § 8–103, subsec. A as a whole, it seems clear that the legislature has expressed the intention that "under" the "circumstances" outlined in subdivision (e) quoted above, the requirement of consent contained in subdivision (b) is inapplicable.

Both subdivisions (c) and (d) of this section also have pertinency:

"(c) A guardian of the child appointed in a separate proceeding, with authority to consent to adoption, if neither parent is living, or both parents have been legally declared insane or incompetent, *or the parental rights of both parents have been divested as provided by law.* If the guardian appointed is one of the adopting parents, consent shall also be obtained from a public or private child welfare agency licensed under the provisions of chapter 5 of this title to place children for adoption." (Emphasis added.)

"(d) The parent whose rights have not been divested or relinquished, *if the parental rights of one of the parents have been divested* or relinquished *in a lawful manner.*" (Emphasis added.)

It seems very clear from these provisions that if the rights of a natural parent whose child is born in wedlock had been divested in a legal manner, the consent of such parent is not necessary. It does not seem reasonable to this court that the rights of a father of a child born out of wedlock would be any greater.

The public policy served by not requiring consent of or notice to a parent whose parental rights have been legally divested is obvious upon consideration. The objective sought in adoption is to provide a child with parents who will be, as much as possible, substitute parents in every sense. If natural parents are to be notified of adoption proceedings instituted by the adoptive parents selected by adoptive agencies in every case except when there has been a relinquishment, there will always be the possibility of interference by the natural parents in the lives and affairs of the adoptive family. This is particularly so in the case of parents whose conduct and temperament justify a divestiture of parental rights. An alcoholic mother or father, for instance, can destroy the well-being of an adoptive home. In this particular case there may be prospective adoptive parents who would be eager to accept a newborn babe from an adoptive agency but who would not undertake to litigate for the custody of the child in an adoption court against a headstrong 19 year old putative father.

The conclusion is inescapable, in reading A.R.S. § 8–103, that it is contemplated that *some* court should have the authority to divest the rights of parents in children prior to the filing of the adoption petition. This is also clearly implied in A.R.S. § 8–512, subsec. A, which reads:

"When a child welfare agency licensed to place children for adoption has the permanent care, custody and guardianship of a child, *and the rights of the parents of the child have been terminated by order of a court* or by a legally executed relinquishment of parental rights, the child welfare agency may give legal consent to adoption of the child." (Emphasis added.)

■ Even without statutory authorization, the power of a court of general jurisdiction to sever the rights of parents in their children, for good and sufficient cause, is probably inherent in the court, independent of statute:

"Although the early common law was to the contrary, public policy, as evidenced in recent years both by statutes and judicial decisions, has, in doing away with the archaic idea that the father's power over his child is absolute, firmly established the principle that the state, through its courts, may regulate and restrict, and *entirely supersede if necessary*, the natural right of a parent to the exclusive custody and control of his child. This superior authority of the state as parens patriae was exercised in England by the courts of chancery, and in this country is a common subject of equity jurisdiction, which may be exercised independently of statute, even though the case involves strictly personal, rather than property, rights." (Emphasis added.) 39 Am.Jur. Parent and Child § 18, pp. 604–605.

■ In this state, by Constitution (Art. 6, § 15) and by statute (A.R.S. § 8–202) the superior court, when acting as a juvenile court, has " * * * exclusive original jurisdiction in all proceedings and matters affecting neglected, dependent, incorrigible or delinquent children." If *any* court has the power to sever parental rights of neglected or dependent children, it would seem to be reposed in the juvenile court. Specific statutes clearly give the juvenile court the authority to supersede parental rights. Reading the juvenile code of this state as a whole, and particularly A.R.S. §§ 8–231, 8–233 and 8–236, subsec. C, this court holds that the authority to sever parental rights for proper cause is granted to the superior court while sitting as a juvenile court.

■ In passing, it should be emphasized that such action may only be properly taken after the natural parent or parents have been given proper notice and an opportunity to be heard and to present evidence on the question of severance. 39 Am.Jur. Parent and Child § 17, p. 604; 67 C.J.S. Parent and Child, § 13 c, p. 671.

It should not be understood that this court, in ruling as it has, is giving approval in advance to the complete severance of the parental rights, such as they be, of the petitioner. The writ that is sought is to prohibit the court from holding a hearing to determine whether these parental rights should be severed. The record does not indicate in any way that the petitioner's case has been prejudged. A mere adjudication of dependency does not automatically authorize severance of parental rights. Each case demands that the juvenile court carefully consider the welfare of the child in order to arrive at the best determination that the juvenile court can conceive for the particular child under the particular circumstances affecting it.

For the reasons heretofore stated, the alternative writ of prohibition heretofore issued is quashed and the petition for a permanent writ of prohibition is denied.

KRUCKER, C. J., and HATHAWAY, J., concurring.