**ROBERTS et ux. v. BIGGS et ux.**

No. 35294.

Supreme Court of Oklahoma.

April 28, 1953.

Rehearing Denied May 19, 1953.

Application for Leave to File Second
Petition for Rehearing Denied
July 13, 1954.

Paul W. Updegraff, Norman, for plaintiffs in error.

Herbert Hodge and Person E. Woodall, Norman, for defendants in error.

BLACKBIRD, Justice.

This appeal has been taken from a judgment in a habeas corpus proceeding instituted by James Milton Biggs and his wife,

Marie Moselle Biggs, to obtain from Mr. and Mrs. Harvey Roberts the custody of their infant daughter, Deborah Sue.

Mr. and Mrs. Biggs, residents of Kilgore, Texas, were married in 1942 when the latter was only seventeen years of age. During the first eight years of their marriage, Mrs. Biggs gave birth to five children and had three miscarriages. At the time of the trial the oldest of these children was 8½ years of age and the youngest, Deborah Sue, was only 17 months old. After the birth of her third baby, John Gary, Mrs. Biggs, being in a weakened and nervous condition from bearing or attempting to bear a child each year, went for a rest to the home of a sister in another Texas city, against her husband's wishes. She left home again after the birth of her fourth child, Sherry, and wanted to again, in February, 1950, when Deborah Sue was only a few days old. Her husband continued to oppose these trips away from home, but when Deborah Sue was 2 or 3 months old, Mrs. Biggs "got to feeling so bad" that she went to a doctor, who examined her and advised her to go to a hospital. Her husband then consented to her leaving the family and the two commenced trying to make arrangements for the care of the children. In this endeavor, they first went to see an acquaintance by the name of Mrs. H. A. Forrester, there in Kilgore on September 10, 1950. Mrs. Forrester testified that they told her they were separating and it is undisputed that they asked her if she would like to take the baby Deborah Sue and perhaps one of the older daughters. She further testified that after questioning the couple, in an effort to ascertain if they fully realized what they were doing, she indicated that she was not in a position to take any of the children, but told them she had a sister in Norman, Oklahoma, who would be glad to take one or two of them, and promised that she would get in touch with them later as to this. On or about September 13th, Mrs. Biggs left Kilgore and went to West Texas. She was out there approximately a month before going to Bakersfield, California, where she began living at her brother's home and though she had never been so employed before, and, accord-ing to her testimony was still in poor health and weighed only 91 pounds, she became a waitress in a cafe. The evidence further discloses that during her absence from Kilgore she was guilty of misconduct in her relations with others, unnecessary to detail here.

After Mrs. Biggs departed from Kilgore, Texas, Mr. Biggs, lived with his wife's brother there for a week during which time the Biggs' children were taken to their paternal grandparents' home; and the next Monday, or about September 18, 1950, he contacted Mrs. Forrester again concerning the placing of the baby, Deborah Sue, and her older sister Sherry. Mrs. Forrester then telephoned Mrs. Roberts, her Norman, Oklahoma sister, who, with her husband, a Norman businessman, had an adopted son three years old, and had been wanting to adopt a little girl, too. Mrs. Forrester told Mrs. Roberts that Mr. Biggs wanted someone to adopt Deborah and a few days later Mr. and Mrs. Roberts came to Kilgore to look into the matter. When they arrived they found Deborah at Mrs. Forrester's home and ascertained definitely from Mr. Biggs that he wanted to give the child to them for adoption. They then consulted the County Judge and later a Longview lawyer, after which, Mr. Biggs executed, before a Notary Public of Texas, a sworn instrument designated as Respondent's Exhibit 3, in which he represented that he did not desire to retain control and custody of Deborah Sue, and purported to "relinquish benefit of parental legal rights" over her, agreed that she should be "offered for adoption", and waived "issuance of notice to me of any adoption hearing and proceedings pertaining to my said child and agree that such hearing may be had at any time." Mr. and Mrs. Roberts then brought Deborah Sue back to their home in Norman, where she has since lived and been cared for, and apparently loved in a most commendable manner and as if she were their own child, *without court proceedings ever having been instituted for her adoption.*

In April, 1951, Biggs obtained a decree of divorce by default from his wife, who had no notice of such proceedings. (Inci-

dentally the allegations or grounds upon which he obtained this divorce to not appear in the record).

While in California, Mrs. Biggs started corresponding with Mr. Biggs in Texas, and they agreed she would return to Kilgore and they would resume marital relations with each other on condition that she could forego bearing any more children. This agreement was carried out when Biggs sent his wife money to come home on and she did so return; and her husband had an operation performed upon himself similar to, or in the nature of, a vasectomy which rendered him sterile or incapable of reproducing. The Biggs then got their children together, (except Deborah Sue), and re-established a home at Kilgore, and almost immediately thereupon commenced trying to regain custody of Deborah from Mr. and Mrs. Roberts, their efforts culminating in their present proceedings for a writ of habeas corpus.

After Mr. and Mrs. Roberts had filed their response to the Biggs' petition for the writ and the issues had otherwise been joined by pleadings, the Roberts moved for a postponement of the trial to allow them to take depositions and investigate Mr. and Mrs. Biggs' background in Texas and California.

During the postponement Mr. and Mrs. Biggs returned to their home in Kilgore, Texas, where they were remarried on July 20, 1951, and when this cause finally came on for trial, July 23, 1951, were apparently living normal and exemplary lives as dutiful spouses and parents. At the trial it was shown that Mr. Biggs was then regularly employed 7 days a week at wages of $1.35 per hour, sometimes totalling $16 per day. Both he and his wife testified that since her return from California, her health had improved, she had gained weight and was a "changed" or different person from what she was before she left her family, being now normal in every respect.

After hearing proof of the above related undisputed facts and many others not now necessary to mention, the trial court granted the writ and awarded custody of Deborah Sue to the natural parents and petitioners, Mr. and Mrs. Biggs. In their appeal from said judgment, the Respondents, Mr. and Mrs. Roberts, allege that on the basis of the evidence, the court erred in said judgment.

The parties will hereinafter, when not designated by particular name, be referred to as "Petitioners" and "Respondents", respectively, as they appeared in the trial court.

Respondents say the well-established rule in this jurisdiction is that the only issue to be determined in a case of this nature is what would be for the best interest of the child involved. They argue that the court cannot be said to have served the best interest of Deborah Sue in returning her to parents who had willfully and knowingly "abandoned" her, and to a mother who showed no intention of returning home until an encounter with law enforcement agencies in California.

Among the cases relied upon by Petitioners in support of their position and the trial court's judgment, is Hedtke v. Kukuk, 93 Okl. 264, 220 P. 615, in which it was held that a parent who is of good character and a proper person to have the custody of his child is entitled to such custody as against others seeking to hold it, and the burden is upon the latter to show either that the parent does not possess such character and is not a proper person for such custody, or that they hold the child under a competent court order. In speaking of this presumption which operates in favor of the natural parents as between them and others not so related to the children involved, the court in Risting v. Sparboe, 179 Iowa 1133, 162 N.W. 592, 594 L.R.A.1917E, 318, said:

"Human experience has demonstrated that children ordinarily will be best cared for by those bound to them by the ties of nature, 'bone of their bone and flesh of their flesh.'

"Something more than the material things of life is essential to the nurture of a child, and that something is the father's and the mother's love, or as near its equivalent as may be. Recog-

nizing this, the law raises a strong presumption that the child's welfare will be best subserved in the care and control of parents, and in every case a showing of such relationship, in the absence of anything more, makes out a prima facie case for parents claiming the custody of their children. 'Indeed,' as said in one case, 'this presumption is essential to the maintenance of society, for without it man would be denaturalized, the ties of family broken, the instincts of humanity stifled, and one of the strongest incentives to the propagation and continuance of the human race destroyed."

■ Apparently having in mind the evidence showing how well Deborah Sue has been provided for in the Roberts' home, including Mr. Roberts' testimony that his income is usually around $12,000 per year, counsel for the Petitioners call our attention to the principle that the issue in cases like this is not to be decided upon a comparative basis, that is, upon consideration of which of the contestants for custody is more fit or can do the most for the child; but that the unfitness required to deprive natural parents of their child must be "positive" rather than "comparative", citing Sherrick v. Butler, 175 Okl. 538, 53 P.2d 1097; Jamison v. Gilbert, 38 Okl. 751, 135 P. 342, 47 L.R.A.,N.S., 1133; Norval v. Zinsmaster, 57 Neb. 158, 77 N.W. 373, 73 Am.St.Rep. 500. We think from an examination of our laws and decisions on the subject, it can be said, as was said in the last-cited case and some of the decisions referred to therein, that our statutes declare, and "nature demands", that the right of custody of children shall be in their parents, unless the latter be affirmatively shown unfit; and to overcome the presumption of natural parents' suitability and fitness, the proof should be clear and convincing. And, as held in Jamison v. Gilbert, supra, and followed in Scroggin v. Griffin, 185 Okl. 456, 94 P.2d 244, and Alexander v. Kennedy, 190 Okl. 6, 119 P.2d 823, such proof must show that the parents' life or character and habits are such that provisions for the child's ordinary comfort and contentment or for its intellectual and moral development cannot *reasonably be expected* at the parents' hands.

■ The evidence upon which Respondents must necessarily rely for showing Petitioners' unsuitability, as parents, and for regaining actual custody of their child (as distinguished from "legal custody", of which they have never been divested by court action), deals with their past misconduct hereinbefore alluded to. Mrs. Biggs frankly and truthfully admitted such misconduct. However, there is other evidence that in our opinion is more significant than these facts. Such evidence casts doubt or question upon Mrs. Biggs' reason and accountability or responsibility for her conduct. It is remembered that the testimony of her and her husband was to the effect that after Deborah Sue, her last baby, came, and after having undergone five live births and three miscarriages during her short 8-year period of marriage, she was in poor or frail physical health; that her physician advised her that she needed to be hospitalized; and she was advised to see a psychiatrist; and while in Bakersfield she was under the care of one. The evidence tends to show that her physical condition had not only been affected by her experiences from almost continual pregnancy since her youthful marriage, but that she was in a mental state of depression and despair from her need to escape this too constant taxing of her body. From both hers and her husband's testimony, he appears to have been unsympathetic and uncooperative in the matter. It has become a matter of medical certainty and more or less common knowledge, that such continued taxing of a woman's body in such manner, especially one that is not robust to begin with, may not only have detrimental physical effects, but may result in detriment to the nervous system and bring about temporary or permanent mental unbalance and changes in personality and/or character. According to the evidence, such effects were temporary in Mrs. Biggs' case, and she has changed in every way since her return from Cali-

fornia; her husband has had his operation; and she is no longer under the constant dread and strain of pregnancy. She and her husband have been to their minister, where she has made a full confession of her sins and has become a Christian. While some of Mrs. Biggs' past conduct was unlawful, deplorable and shameful, upon consideration of the facts with reference to her physical condition at the time and the inferences that may legitimately be drawn therefrom as to its effect on her reasoning powers and immature judgment, we are inclined to adopt a tolerant view of it. According to the evidence she now fully realizes the error of her former ways. Nor is Mr. Biggs' previous conduct commendable or to be condoned; but we do not think that under the circumstances, great blame or censure should be placed upon his turning Deborah Sue over to the Roberts, when he did. This, rather than being conclusively and unequivocally interpreted adversely to him and as showing his voluntary abandonment of her or his lack of a normal father's love, and feeling of responsibility toward his child, we think that such effort to assure her of a good home and care, may as well, or better, be interpreted as showing his love for her and solicitiousness for her welfare. It must be borne in mind that Biggs' arrangement for placing Deborah Sue in a good home were made at a time when his own home was losing the baby's mother and natural nurse and caretaker, and, it was figuratively "falling apart." He was unable himself to earn the baby's livelihood and at the same time, give her the almost constant home care required by such an infant or babe in arms.

We cannot say that the trial judge was not justified in taking the above matters into consideration and giving the evidence mentioned full credence; and, rather than determining the Biggs' fitness and suitability as parents altogether on the basis of their past conduct, giving them the benefit of any doubt as to what could reasonably be expected of them in the future. As we have seen, the propriety of entrusting parents with the custody of their own children is upheld by the presumption in their favor that can only be overcome by clear and convincing evidence. If we were to reverse the judgment of the trial court, who had the opportunity of hearing the witnesses and observing their candor and demeanor and other things indicative of their truthfulness or lack of it, we would have to hold that said judgment is clearly against the weight of the evidence. See Osburn v. Roberts, 197 Okl. 206, 169 P.2d 293. On the basis of the evidence tending to support it, we cannot so hold. The judgment of the trial court is therefore affirmed.

HALLEY, C. J., and JOHNSON, V. C. J., and WELCH, CORN and DAVISON, JJ., concur.

O'NEAL, J., dissents.