[Civ. No. 4648. Fourth Dist. Feb. 24, 1954.]

Guardianship of GERALD DAVID WILLIS, a Minor. CECIL WILLIS, Appellant, v. WALLACE NEILL et al., Respondents.

David S. Folsom for Appellant.

Robert R. Rosson and A. Hugo Pearson for Respondents.

MUSSELL, J.—On July 16, 1952, Cecil H. Willis, hereinafter referred to as "Willis," filed a petition herein for appointment as guardian of his minor son, Gerald David Willis, then of the age of 2 years, hereinafter referred to as "Gerald." On August 8, 1952, Wallace Neill and his wife, Margaret, who then had custody of the child, filed a petition in the juvenile court to have him declared free from the custody and control of his father. The two proceedings were consolidated for hearing by stipulation and the trial court denied the petition of Willis to be appointed guardian and also denied the Neill petition. However, the court appointed Wallace Neill and his wife as guardians of the child and awarded them his sole custody, subject to reasonable visitation by the father.

In his appeal from the order and judgment denying his petition and appointing the Neills as guardian Willis contends (1) That a finding of unfitness is essential before a parent can be deprived of the custody of a child; and (2) That the finding of the trial court that "Cecil H. Willis is not a fit person to be the guardian of the person of the minor child, Gerald David Willis" is not supported by the evidence.

Cecil and Beulah Willis were married October 24, 1931, and at the time of the trial herein there were 10 living children of the marriage, including Gerald, who was born on July 10, 1950. His mother, Beulah, died five days later and was in ill health during the last three months before her death. The family then lived in Corcoran and the home was in a deplorable and filthy condition. Willis, the husband and father, was working for the Kings County Road District for $205 per month. He also worked in the evenings and on vacations for a lumber company to help support his family.

Gerald was a premature baby and when he was 19 days old he was released from the hospital and Willis placed him with Mrs. Wallace Neill and her husband. The child was then in very poor health and the Neills nursed and cared for him to such an extent that he has now become a healthy child. He has been in the custody of the Neills since he was first accepted by them. He is well cared for and has a comfortable, well kept home.

After the death of Beulah Willis the Welfare Department supplied aid to the Willis family by paying for the support of Gerald and employing a housekeeper. The home conditions then improved and in the latter part of 1950 Willis employed a Mrs. Wright as housekeeper. She lived with the Willis family

for several months. At the time of the trial both she and Willis stated they were in love with each other and planned to marry as soon as she was able to obtain a final decree of divorce from her husband. In August, 1952, the Willis family moved to Bakersfield and at the time of the trial Willis and his children, Mrs. Wright and her minor child all lived there in a comfortable three bedroom house. The home and the children were kept neat and clean. Apparently Willis and Mrs. Wright were married since the trial.

There was evidence that on one occasion Willis, while intoxicated, took one of the children and drove his automobile to the home of a friend; that on another occasion he drove his car at a "very dangerous speed in a erratic manner" when three of his small children were in the car with him; that on the same date he used vile and abusive language in the presence of children, became intoxicated, rolled off a couch in the living room of his home and lay there cursing; that on several occasions Mrs. Wright used profane language in the presence of the Willis children; that on one occasion she created a disturbance in a store in Hanford. In this connection Mrs. Neill testified that Mrs. Wright swore at her and that "she told me that I felt like I was so God damn smart she would beat the God damn hell out of me right there." The evidence shows that Willis visited Gerald occasionally and that he paid the Welfare Department for the child's support until April, 1952, when the Neills refused to give him possession of the child.

The trial court found:

"That in view of all the evidence and because the home now maintained by the said Cecil H. Willis is now occupied by said Cecil H. Willis and eight (8) of his children, and a housekeeper, who is his promised bride, and her child, eleven (11) persons in all, and in view of the smallness of the home for such a large family, and because of the unladylike demeanor of the housekeeper, Mrs. Wright, and because of the fact that she is the promised bride of the said Cecil H. Willis, although *not* finally divorced from her husband, and residing in the same home of the said Cecil H. Willis and the minor children, and because of the additional fact that the sleeping conditions of said home are not satisfactory, all of which would not be for the best interests or moral welfare of the minor child, Gerald David Willis, said Cecil H. Willis is not a fit person to be the guardian of the person of the minor child, Gerald David Willis.

''That Wallace and Margaret Neill are fit and proper persons to be the guardians of the person of the child, Gerald David Willis.''

It is contended by appellant that this finding is not supported by the evidence. We are in accord with this contention. The trial court heard and determined the issue as to whether Willis was a fit and proper person to have the custody of his child. (*Stewart* v. *Stewart,* 41 Cal.2d 447, 453 [260 P.2d 44].) As was there said:

''It is true that a change of custody of children may entail 'serious emotional disturbance.' The courts are concerned with avoiding these distresses and are· given wide discretion within the law in the determination of such matters. . . . 'The discretionary power of a trial court necessarily is limited by those provisions of the code wherein the express policy of the Legislature regarding general questions of custody are set forth (Civ. Code, §§ 138, 197; Prob. Code, §§ 1407-1408) and by the judicial interpretation of those code provisions in relation to the specific questions presented by the instant case.' . . . The code sections contemplate that the care of a minor child be awarded to a parent, if a fit and proper person, as against a stranger. . . . The Supreme Court of the United States has well pointed out the guiding principle in custody cases in *Prince* v. *Massachusetts,* 321 U.S. 158 [64 S.Ct. 438, 88 L.Ed. 654]. It is there said at page 166: 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. (Citations.) And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter.' ''

The court also stated that the issue of fitness should be tried out in the usual way with evidence and findings on the subject.

█ Fitness of the father to have the custody of a child must be determined as of the time of the hearing on the petition. (*Guardianship of McCoy,* 46 Cal.App.2d 494 [116 P.2d 103].) █ The evidence shows that Willis was honest and industrious, that at the time of the hearing he was working for a construction company as a blade operator and was earning $500 per month. The family was living in a three-bedroom home, with bath, large living room and a three-quarter acre, fenced yard. The house was kept clean and the children were clean, well fed and clothed. There is no evidence that Willis mistreated or abused any of his children.

There was testimony that he treated them as well as any father could under the circumstances. While the record shows that he became intoxicated on one or two occasions, the trial court found he was not habitually intemperate. Mrs. Wright was employed by Willis as a housekeeper and lived with the family. However, the evidence is that she did not sleep in the same room as Willis and there is no evidence that she indulged in any immoral acts with him and there is no finding to that effect. The circumstances under which Willis left his child with Wallace Neill and his wife do not indicate that he intended to abandon it and the understanding was that he was to take the baby when he was able to take care of it. Mrs. Neill told Willis she did not want any support for the child. However, Willis paid for its support until April, 1952, when Mrs. Neill refused to permit him to take it.

Under the circumstances disclosed by the record the finding that Willis is "unfit" is not supported by substantial evidence. As stated by Mr. Justice Schauer in his dissenting opinion in *Guardianship of Smith*, 42 Cal.2d 91 [265 P.2d 888], to brand a parent as unfit would almost certainly mean that the parent could never hope to gain either the respect or affection of his child. The finding of unfitness necessarily implied that Willis was unfit to care for all of his other children, an implication not supported by the record.

Apparently the word "unfit" has not been defined by statute in this state. In *Richards* v. *Forrest*, 278 Mass. 547 [180 N.E. 508, 510], it is said:

"In general, the word means unsuitable, incompetent, or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. Violence of temper, indifference or vacillation of feeling toward the child, or inability or indisposition to control unparental traits of character or conduct, might constitute unfitness. So, also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit, apart from other moral defects."

As stated by Mr. Justice Traynor in his concurring opinion in *Guardianship of Smith, supra,* 95:

"Unless the upbringing of the child is so defective as to call for action by the juvenile court, it is unlikely that an outsider will challenge the parental custody or seek by legal process to prove that the child's welfare would best be served elsewhere. It is generally understood that the stability of

established family units would be ˙jeopardized by outside interference.''

One of the apparent reasons for the court's finding that it would not be for the best interests or moral welfare of the child to be awarded to his father was that the Willis home was too small for such a large family and that the sleeping conditions were not satisfactory. ██ However, as was stated in *Guardianship of Smith, supra,* 92:

''Where a parent applying for custody is in a position to take the child and is not shown to be unfit, the court may not award custody to strangers merely because it feels that they may be more fit or that they may be more able to provide financial, educational, social, or other benefits.''

The record indicates that Willis was attempting to the best of his ability to properly provide for and care for his children; that he was affectionate toward his children and that they all loved him. The evidence is insufficient to support the order and judgment depriving Willis of the custody of his son, separating the members of his family and depriving the child involved of the comfort, companionship, love and affection of his brothers and sisters and his father.

Judgment and order reversed.

Barnard, P. J., and Griffin, J., concurred.