Ella McVEY, Plaintiff in Error,

v.

Bertha CHESTER, Defendant in Error.

No. 36802.

Supreme Court of Oklahoma.

Oct. 11, 1955.

Melton, McElroy & Vaughn, Chickasha, for plaintiff in error.

Calvin Strother, Chickasha, for defendant in error.

JOHNSON, Chief Justice.

This proceeding originated in the County Court of Grady County, Oklahoma, on petition for the appointment of Bertha Chester, paternal grandmother of Wilma Jean, Carol Sue, and Tommy Joe Chester. Mrs. Ella McVey, mother of the three minor children filed a protest against the appointment of Mrs. Chester and asked that she, and not Mrs. Chester, be appointed as guardian of both the persons and estates of her children. Upon hearing the County Court appointed Mrs. Chester as guardian of the children's persons and estates.

Upon appeal to the District Court and trial de novo, the District Court in effect affirmed the action of the County Court, with the further finding that the mother, Ella McVey, was not a fit and proper person to have the care and custody of said minor children and that it was for the best interest, general and moral welfare of said children that Bertha Chester be appointed guardian of the persons and estates of the children, thereby depriving the natural mother of their custody, apparently following the rule announced in In re Guardianship of Hight, 194 Okl. 214, 148 P.2d 475, and other similar cases requiring a finding of parents' unfitness to have the care and custody of their children before depriving them of their custody.

Motion for a new trial was overruled resulting in this appeal.

The cause is argued under two propositions, which, in substance, are that the judgment is not within the issues, and is contrary to the law and the evidence.

The argument that the judgment is not within the issues is without merit. But from a careful examination of the record, we think the contention that the judgment appointing another than the surviving parent as guardian of the persons of the minors is contrary to the law and the evidence is well founded.

Upon conclusion of the trial de novo, and after argument of counsel, the District Judge prefaced his judgment with the following remarks, to-wit:

"The court has known these two parties for many years. The mother of these children I handled as a juvenile deliquent when I was County Judge. I also on one occasion accompanied the Sheriff's force on a raid of her father's house. From the

evidence in this case the Court can draw no other conclusion than that she is at this time a bigamist, and that she showed absolutely no regard for these children during her married life with the father of these children. The Respondent showed very little interest in these children when they needed care and attention. Now that her former husband was killed in an industrial accident and there is social security, Veterans benefits and a death claim to be settled she comes into this Court and asks relief that the Court cannot possibly feel her conduct in the past has justified. It is true that the Petitioner is a rather elderly lady, but I have known her also for many years. I know her to be a kind, considerate mother, who has raised a large family of her own and also two other sets of children of her relatives. In spite of her age I cannot help but feel that she is a deserving woman and that the affection of the children for her, as well as her affection for them, as well as the general background and conduct on the part of the Respondent forces this Court to award these children to the Petitioner. Naturally I have no desire to destroy nor to prevent the Respondent from visiting the children at reasonable times and under reasonable conditions, and I think that the Petitioner should encourage these children to honor and respect her as their mother, and I believe she will."

In this case as in In re Guardianship of Hight, supra, this appeal interposes two questions. First, did the County Court, in the first instance, and the District Court on appeal, properly appoint a guardian of the estates of said children? Second, did the court properly appoint Bertha Chester as guardian of the persons of said minors?

The first question must be answered in the affirmative. Undisputedly the minors had an estate, consisting of death benefits under the Workmen's Compensation Act, 85 O.S.A. § 1 et seq., accruing by reason of their father's death requiring the appointment of a guardian, whose every act concerning the minors' property and estates will be under the statutory provisions for the protection of estates of minors, supervised by our courts. See 58 O.S.1951 § 761 et seq., and 30 O.S.1951 § 1 et seq. The parent, as such, has no control over the property of the child, 10 O.S.1951 § 8, while the authority of a parent over a child ceases upon the appointment by a court of a guardian of the person of the child. 10 O.S.1951 § 9.

The second question is the gravamen of appellant's complaint, and requires a thorough examination of the record (evidence) and the applicable law.

Unquestionably, the trial Court's order depriving the mother of the custody of her children by the appointment of another as guardian of their persons is based upon his finding her to be an unfit person to have the care and custody of them.

Ordinarily, when one parent, having minor children's custody dies, the other parent becomes entitled to such custody unless it clearly appears that the surviving parent is unfit to have the children's custody, in which case, their welfare forbids award of custody to such parent. But in awarding custody and appointing guardians of children, children's welfare is paramount to their parent's claims, 30 O.S.1951 § 11, In re Guardianship of Hight, supra, and cases cited therein. See also Roberts v. Biggs, Okl., 272 P.2d 438, and cited cases.

Another rule very pertinent in the instant case is that a parent's fitness to have the custody of a child must be determined as of the time of hearing of the petition. In Guardianship of Willis, 123 Cal.App.2d 446, 266 P.2d 944. This rule was applied by the trial judge in Roberts v. Biggs, supra, and approved by this Court on appeal. Whether the trial court's judgment is in accord with these applicable rules of law must be determined from an examination of the entire record including the trial Judge's statement hereinbefore quoted.

Though there was no evidence offered of the mother's juvenile delinquency, yet it is obvious from the Judge's statement, supra, that he gave evidentiary consideration to his knowledge of such part proceed-

ings, dehors the record, in finding her an unfit person to have the custody of her children. This was error. Under 10 O.S. 1951 § 101, it is provided:

" * * * a disposition of any child under this Article or any evidence given in such cause, shall not in any civil, criminal or other cause or proceedings whatever in any court be lawful or proper evidence against such child for any purpose whatever, * * *."

Similar statutes have been enacted in many of the states, including the United States, all having safeguarding provisions prohibiting the use of juvenile dispositions or any evidence given in such proceedings against the child in other proceedings. See 1 Wharton, Criminal Law, 12th Ed. (1932) Secs. 369–371; 1 Wigmore, Evidence 2d Ed. Sec. 196; Van Waters, the Socialization of Juvenile Court Procedure, 13 Journal of Criminal Law and Criminology 61, 67; Facts about Juvenile Delinquency, Children's Bureau Pub. No. 215, (U. S. Dept. of Labor 1932) 30. In Thomas v. United States, 74 App.D.C. 167, 121 F.2d 905, at page 908, in referring to such statutes, it is said:

"Their enactment is founded upon strong social policy, and their aim is amnesty and oblivion for the transgressions of youthful offenders."

■ The further without-record-basis statement of the judge, referring to his having on one occasion accompanied the sheriff's force on a raid of Mrs. McVey's father's house is equally erroneous.

We next consider the judge's statement and conclusion as to Mrs. McVey being a bigamist.

There was evidence that Mrs. McVey brought suit for divorce in California; that her first husband left California immediately thereafter and brought their children to Oklahoma where he and they lived with his mother and father until he died from an industrial accident. The fact that she and her present husband were married about a year after alleged California divorce action by ceremonial marriage is undisputed. It is further undisputed that they have ever since and for more than two years prior to this present action lived together in good repute as man and wife, both in California and Oklahoma, and at this time she is making no claim to any benefits from her first husband's estate.

■ The rule in this state is that when a second marriage has been shown, a strong presumption is raised in favor of its legality, and such presumption is not overcome by mere proof of a prior marriage, which is substantially all that was shown in the instant case. See Chancey v. Whinnery, 47 Okl. 272, 147 P. 1036, 1038, and cited cases. Therein we approved the foregoing rule, to-wit:

"The authorities, with very general accord, are to the effect that, when a marriage in fact has been shown, the law raises a presumption that it is valid, casting the burden on him who questions it, to establish its invalidity. This is one of the strongest presumptions known to the law."

■ The trial court's conclusion that Mrs. McVey was a bigamist was unjustified under the law and the evidence.

A brief résumé of the pertinent facts as reflected by the record and as outlined by appellant's counsel are substantially that appellant and Bill Chester were married at El Reno, Oklahoma, on the 23rd day of July, 1941. She was sixteen and he was eighteen. They were practically without funds and lived in a little one room cabin in the yard of his parents. On July 30, 1942, Wilma Jean was born in California, and on July 5, 1943, Carol Sue was born. On December 29, 1944, Sandra Kay was born, but died on the 25th day of September, 1945, and on July 23, 1946, Tommy Joe was born. After their marriage they lived in various and sundry places, under very poor living conditions; that they got along fine until the birth of Tommy Joe, at which time she was injured to such an extent as to prevent normal marital relationship, and he became interested in other women. Bill had a lady friend by the name of Harriett, whom he often accompanied to various places in California and brought her to their home, which caused trouble be-

tween them. During this time she often tried to get him to take her to a hospital for a corrective operation so that she would be well again, but he refused and continued in his way, resulting in their final separation. In 1950 she employed an attorney in the State of California to bring a divorce action against her husband and for custody of their children. The record is not clear as to why she did not get a copy of the divorce decree, but she was assured by her attorney that she had performed every act necessary to effect the legal separation; that about midnight, when the summons would have been served upon her husband (Bill Chester) in the case in California, he and his girl friend Harriett and some of the friends of the Chester family, and who testified in the case, helped her husband (Bill Chester) pack their belongings and with the three minor children came to Oklahoma, where they resided with his parents until his death on June 8th, 1954. Even though she was left without funds, she managed to have the necessary operation. As soon as she was able financially and physically, she came to Oklahoma to see the children where she learned that Bill Chester, the children and Harriett, the California girl friend, had all been living in his parents' home. Bill Chester at this time told her that she could not have the children and that he would kill them before he would let her have them, and for that reason she did not try to obtain custody of them. She visited them as often as possible; bought them clothes at various times and corresponded with them continuously. There was and is mutual affection between her and the children. The oldest girl wrote her letters asking advice, and sent her Mother's Day cards, telling her that she meant the world to her; that when she and her husband, John Edward McVey, learned of Bill Chester's death, they immediately came to Oklahoma to get the children and learned when they arrived in Grady County, Oklahoma, that Bertha Chester, their paternal grandmother, had filed an application to be appointed guardian of the persons and estates of her children, which, as heretofore shown, she unsuccessfully protested.

The evidence also shows that until the birth of Tommy Joe in 1946, she took care of all three children. That she worked with her husband, Bill Chester, in fruit orchards and picked cotton helping support their family. They worked together and played together until the birth of their last child.

The record further reflects that John Edward McVey, her present husband is a fine young man and that their home life and conduct since her marriage to him has been exemplary; that her present husband's income is over $6,000 annually, and that he has no children, and that he would like very much to have his wife's children in their home.

■ When the evidence is considered in the light of the fitness of the mother to have the custody of her children, as of the time of the hearing of the petition, the judgment of the trial court is clearly against the weight of the evidence.

■ The judgment is affirmed as to the order appointing Bertha Chester guardian of the estates of said minors, but is reversed in so far as it appoints her guardian of their persons. The cause is remanded with directions to vacate the order appointing Bertha Chester as guardian of the persons of the minor children, and by appropriate order appoint Ella McVey, their natural guardian and mother, as guardian of the persons of said children.

CORN, DAVISON, BLACKBIRD and JACKSON, JJ., concur.

WELCH and HALLEY, JJ., concur in part and dissent in part.

WILLIAMS, V. C. J., dissents.

WELCH, Justice (concurring in part and dissenting in part).

I concur in that part of the majority opinion granting to the mother the guardianship of the persons of the children. I dissent to that part of the majority opinion granting the guardianship of the estates of the children to the grandmother. I think that both guardianships should be

lodged together for the best interest of the children, and since the mother is to have the guardianship of the persons of the minors and is to have their custody, I think she should also be granted the guardianship of the estates of the children, to handle whatever of property or estate the children might own during their minority. I cannot find anything in the record to direct or to indicate otherwise.

I am authorized to say that WILLIAMS, V. C. J., and HALLEY, J., concur in these views.