320 P.2d 452

Samuel K. CLIFFORD, Appellant,

v.

R. Reid WOODFORD, Appellee.

In the Matter of the Guardianship of the Persons of: Jacqueline CLIFFORD and Marrie Gretchen Clifford.

Nos. 6482, 6485.

Supreme Court of Arizona.

Dec. 31, 1957.

Rawlins, Davis, Christy, Kleinman & Burrus, and Chester J. Peterson, Phoenix, for appellant.

Henderson, Trew & Clark Ford Dodd and Stockton & Karam, Phoenix, for appellee.

PHELPS, Justice.

Appellant Samuel K. Clifford appeals from a judgment quashing a writ of habeas corpus in which he sought custody of Jacqueline and Marrie Gretchen Clifford, his minor children, by his former wife who subsequently married appellee and cross-appellant, R. Reid Woodford, and further from the court's order directing that letters of guardianship be issued to Woodford and adjudging the latter to be entitled to the custody of said children. Appeal was also taken from certain orders of the court made during the course of the proceedings which it will not be necessary to designate.

Woodford cross-appealed from the order of the trial court entered April 25, 1957 denying his motion to quash the writ of ha-

beas corpus and from its further order denying his motion to consolidate a cause of action instituted by his wife, the mother of Jacqueline and Gretchen, for the appointment of Woodford as guardian of said children, the same being cause No. 37886. Woodford further cross-appealed from certain portions of the order and judgment in the instant case which we deem it unnecessary to set out at this time.

For convenience Clifford will be hereinafter designated as "Clifford", his minor children here involved as "Jacqueline" and "Gretchen" or "the children", and their mother as "the mother" or "their mother", and Woodford simply as "Woodford", and Clifford's present wife as "Charlotte."

In order to understand the situation with which we are dealing we will go back to the year 1942 when Clifford married Constance V. Brooks at Safford, Arizona. The above-named children are the issue of that marriage. Jacqueline will be 15 years of age on her next birthday. Gretchen was 12 years of age on her last birthday. On February 2, 1946 a divorce was granted the mother of the children by the Superior Court of Graham County, Arizona, awarding the custody of said children to the mother and ordering Clifford to pay to her the sum of $150 per month for their support. It also set aside to her Government bonds in the sum of $500. No alimony was awarded the mother.

Clifford thereafter, in August 1946, married his present wife Charlotte and there are now three children as issue of that marriage, ages 9, 7 and 4. On October 29, 1946 Woodford married the mother of the children here involved and to her and Woodford were born as issue of that marriage two children, Dodie and Bobbie, ages 10 and 7. At the time of this marriage Jacqueline was approximately three and one-half years of age and Gretchen was a little over one year old. At the time of the separation of Clifford and the mother of the children Jacqueline was a little over two years old and Gretchen was about one week old. Prior to the separation Clifford was away from home on assignments in the military service with which he was then connected so that the total period of his association with Jacqueline was in the neighborhood of a year. The children lived with Woodford and their mother at all times after her second marriage until November 4th, 1956 the date of her death, and since have been and now are living with Woodford.

On October 29, 1956 the mother who had been informed by her doctor she had but a short time to live filed a petition in the Superior Court of Maricopa County for the appointment of her husband, Reid Woodford, as guardian of the children. Upon hearing, letters of guardianship were directed to be issued to Woodford, but later the order was vacated for lack of bond. Thereafter, on

April 11, 1957, Clifford filed a petition for writ of habeas corpus in the Maricopa County Superior Court seeking custody of the children, and on April 17 following, Woodford filed a petition in the same court for his appointment as guardian of said children. The two cases were consolidated for trial, and after hearing, the court on May 7, 1957 quashed the writ of habeas corpus and ordered that letters of guardianship issue to Woodford and awarded him custody of the children. It is from this order and judgment, and from the order denying his motion to set aside the order and judgment, and to grant him a new trial that Clifford appeals.

Clifford has presented five assignments of error all of which are directed at the court's order quashing the writ of habeas corpus wherein he sought custody of his minor children and at its order appointing Woodford guardian of said children and awarding their custody to him. He argues that our pronouncement in Woodford v. Superior Court, 82 Ariz. 181, 309 P.2d 973, 974, predetermines the issues in this case wherein it said that upon the death of one of the spouses who held custody of minor children pursuant to a divorce decree, the right of legal custody automatically inures to the surviving parent. The court then continued to say in that opinion that, "the legal custody so derived continues until it is shown that such survivor is unfit to assume the responsibilities inherent to parenthood." If the surviving parent is shown to be unfit to assume such responsibilities in the sense that his custody would be detrimental to the best interest and welfare of such children then he is not entitled to their custody.

■ In the instant case as pointed out above Woodford and his wife, the mother of the children here involved, had the custody of these children from their very infancy. They had reared and nurtured them through all the years of their life until their mother's death when Jacqueline was blossoming into young womanhood and Gretchen stood upon the threshold of the same wonderful transformation. They continued in the custody of Woodford after the writ of habeas corpus issued upon the petition of Clifford for their custody. Woodford then sought his appointment as their guardian. He had the right to have the trial court determine the question of what would be for their best interest and welfare in this particular litigation. The writ of habeas corpus alone provided adequate legal mechanism for such determination. However, the court consolidated that case with Woodford's petition for his appointment as their guardian and for the custody of said children. Both cases had for their purpose the same end result; therefore, their consolidation resulted in no prejudice to either party.

262

Conceding that under the rule laid down in Woodford v. Superior Court, supra, Clifford was automatically entitled to the custody of the children upon the death of their mother until it was shown that he was not a fit person to have such custody, we believe Woodford had the right to raise that issue and to show by a preponderance of the evidence, if he could do so, that Clifford was not a fit person to have their custody. This is true if for no other reason than to avoid a multiplicity of lawsuits where the entire matter could be settled in the instant case. Certainly the children should not be subjected to such frustration either by keeping them in a mental condition of uncertainty or by ordering a change of custody until the question of the natural father's fitness was determined. The children have rights that we have consistently held to be superior to even the parents, in that, the court will always look to their best interest in determining their custody.

The primary question presented to us is whether the trial court abused its discretion in determining this most important issue by placing the children in the custody of Woodford. We believe it did not. This court has said that a parent is entitled to the custody of his own children as against anyone else, yet, in every case it has made the further pronouncement, in substance, that the primary consideration of the court in such cases is the best interest and welfare of the child or children, as the case may be, rather than the technical legal right of the parent. Harper v. Tipple, 21 Ariz. 41, 184 P. 1005. In Dickason v. Sturdavan, 50 Ariz. 382, 72 P.2d 584, 586, this court said:

"* * * [T]here can be no question under all the authorities but that in answering the query, Who should have the custody of the children? the pole star by which it is led to a decision is their best interest. While it is true that a father, who is a proper and fit person to care for his child, is entitled to its custody above any other person, since the 'voice of nature, which declares that the father is the natural guardian of the minor child, cannot be silenced,' Harper v. Tipple, 21 Ariz. 41, 184 P. 1005, 1006, yet he must be so fit and suitable for the performance of this most important function that the court can say that the child's best interest will be subserved by placing it in his care and custody. The paramount consideration being the child's welfare, the parents' *prima facie* right to its custody is not an unconditional one. Neither does the sole fact that one is the parent and able and willing to care for it necessarily have this effect, because this could easily be true and yet the best interest of the child be subserved by placing it in the custody of another."

Arizona State Department of Public Welfare v. Barlow, 80 Ariz. 249, 296 P.2d 298, recognized the above to be the rule. See also, Fladung v. Sanford, 51 Ariz. 211, 75 P.2d 685, and In re Winn, 48 Ariz. 529, 63 P.2d 198.

Let us apply this test in considering whether the judgment of the trial court is justified by the evidence, and especially the fitness of Clifford to have the custody of the children in the light of his relationship to them since they were infants in arms until the death of their mother in 1956, a period of over twelve years, and then compare that with the relationship of Woodford to them during that period. It is only by this comparison that the trial court could determine the best interest and welfare of the children. During all this period Clifford never wrote the children until after their mother's death. There is no evidence that he ever sent them a message of greeting of love or anything by anyone that would indicate an interest in them. He neither sent them birthday presents nor greetings at such times. He said he always sent them Christmas presents. Charlotte testified that during the time they lived in Colorado from the spring of 1951 until the death of the mother of the children (November 4, 1956) Clifford neither wrote them a letter nor did he remember them with gifts either on their birthdays or on Christmas. This conflicts with Clifford's testimony that he *always*

sent them Christmas presents. Clifford and his family moved to Colorado in the spring of 1951, and he stated he had not written them at all between that date and November, 1956. Woodford and their mother moved to Tucson in 1946 where he attended the university for four years. During that period Clifford never visited the babies a single time in Tucson. However, when the Woodfords returned to Safford on a visit, which Clifford said was on Thanksgiving, Christmas and holidays, which he said was two or three times a year, their mother notified him of their presence in Safford and he would have them over for a day.

While in the military service he received an allotment from the Government to pay the $150 per month allowed by the court in the divorce decree for the support of his children. He said this amount was allotted in full by the Government. Notwithstanding this fact, he, of his own accord and without an order of court, reduced the payment for the support of his children to $60 per month and continued to withhold $90 of said allotment for the use of himself and family until his attorney told him he could not do so without an order of the court and that before he could have the divorce decree modified reducing such monthly payments he would have to pay all amounts withheld. This he did, amounting to around $500 or $600. He was compelled to do this before he

would have any standing in court to seek a reduction of the $150 allowance. Then upon application to the court the allowance for child support was reduced to $75 per month. This was not paid regularly and he was $225 in arrears on the $75 allowance in the divorce decree at the time of the mother's death. A check for that amount was received later but was returned to him by Woodford. Clifford at the time of this shortage had an income of around $8,000 per year.

Upon his request the children visited in his home in Colorado for two months during the summer of 1952, and he was advised by their mother they could visit him any summer thereafter he wanted them to do so, but he never invited them again, and he did not see them again until 1955 when he and his family stopped in Phoenix on their return from a trip to California and took the children swimming, to dinner, and to a show. This is the year Clifford stated he was injured in some kind of an accident. During the time he was in the military service he had furloughs due while in Albuquerque but never used them to visit his children in Safford, a comparatively short distance from him. He has had vacation allotments of thirty days a year since he began working for the Colorado Game & Fish Department on November 17, 1953, but never has used one to visit his children. He went Elk hunting in 1953 and 1954. From the time of his divorce in February of 1946 until August of that year when he married Charlotte, he was in Safford several times and called his wife and made appointments to see the children. On several occasions he did not keep such appointments nor did he explain why he did not keep them. Clifford testified he did not recall such an occurrence. In each instance the mother prepared them for the occasion. He did come from Albuquerque to Phoenix five or six times from June to August of 1946 to call upon his present wife to whom he was then paying court, but did not take time to visit or even inquire about his children who were then living in Safford.

Can it be said that the trial court was not justified in awarding the custody of these children to Woodford in the light of the above facts regardless of what Clifford's reputation may be among his associates in Colorado or elsewhere? Do the facts above stated demonstrate an affection for these children or even an interest in them which cries out in such anguish against depriving Clifford of their custody that the "voice of nature * * * cannot be silenced" in this case? We think not. We believe the trial court was justified in concluding from this evidence that Clifford's relationship with them from several months before their mother divorced him to the date of her death and up to the date of the trial, was such as to make him unfit to assume the responsibilities of parenthood to these children.

Woodford and the mother of these children during the period of their helplessness in their early infancy necessarily cared for them day and night. They unquestionably shared with them in all their childish joys and disappointments to the date of their mother's death in November, 1956. In that tragic event Woodford walked beside them in their hour of supreme need into the greatest depth of despair to which the human heart can descend or is ever called upon to endure. The evidence shows he loved them as he did his own and they unstintedly returned his love in full measure.

The ties that cement the members of a family into a unit of solidarity is not necessarily the result of blood relation, but they arise out of and are formed by an intimate association sharing with each other the joys and sorrows, the fears and hopes, the successes and failures of each and all. There is a deep seated desire in the breast of every person, whether child or adult, to have some one care about their welfare to whom they may anchor and find peace and contentment in the knowledge that they do care. Jacqueline and Gretchen have found such an anchor in Woodford. They found no such feeling of security or refuge in Clifford. To illustrate: In answering the questions of Judge Stevens, Gretchen stated that some times she got up on the wrong side of the bed and felt as if she were mad at the whole world. She was then asked if when she felt that way she then wanted to go and live with Kemp (Clifford) and Charlotte and she replied, "No, I would rather stay with my daddy now because he *calms* me down." She said he straightened out their problems when she was needling the other children by talking to them in lectures instead of taking them over his knee. She was asked if anything had ever occurred so far as Kemp is concerned which made it difficult for her to get along with him. She said she just didn't feel like Kemp was her real father "because I know my father's ways now and I don't know Kemp's ways too well." She said her mother and father had never said anything about Kemp that wasn't real nice. She said it didn't make any difference to her whether she visits Kemp and Charlotte or not—"I mean it would be nice to go see them, but then it would be nice to stay here, too." When asked if she would rather live with her dad or with Kemp and Charlotte she said, "I would rather live with my dad;" and that she had talked with Jacqueline and Dorothy (Dodie) about it when they were in bed. We recognize that Gretchen's wishes are not controlling upon the court unless it believes it would be for her best interest to place her custody where she desires it to be, but it does furnish a strong index as to the actual relation existing between her and Clifford. Who is at fault for these

poor relations? There can be but one answer—Clifford.

Jacqueline is now fourteen years of age and lacked only thirteen days of being fourteen when the trial court entered its order giving Woodford the custody of both children. Under the provisions of A.R.S. section 14–844 a child over fourteen years of age may appoint her own guardian subject to the approval of the court. Whether the above statute has any application in this case we express no opinion; we simply inject it for the purpose of showing that the legislature considered one's judgment at that age to be of great weight in ordinary guardianship matters. On the same day Judge Stevens talked to Gretchen he also talked to Jacqueline. She said she got along fine with her dad (Woodford) always. She said she had known for several years that Kemp was her real father. She knew there was a difference in her relation to Gretchen and in her relation to the other two Woodford children she said, but that she never felt any difference. She said she was anxious to return from her visit to Colorado "to see my dad and mother mostly;" that she feels just as close to her dad now as she did before her mother passed away; and that she wanted to stay with him. She further said in response to the question of what her thought would be with reference to visiting Kemp and Charlotte from time to time, "I think they should be able to visit me sometimes. I mean after all he is my real father and he should have some time with me." She also said that she would like to go with him, "to just visit him and know him better." When asked if she liked everything she knew about Kemp and thought that he was a good man, she replied that she didn't know very much about him. She said Woodford was understanding. When asked if she remembered how Kemp and Charlotte got along between themselves, she replied: "well, vaguely. Sometimes she would correct him. He would say a foul word, and she would correct him."

We are of the view that Clifford's lack of interest in his children, his indifference toward them and neglect of them, was such as to justify the trial court in finding only genuine father they have ever really known and from Dodie and Bobbie whom they love as much as they love each other and place them in the home of Clifford in that to tear the children away from the an entirely strange environment would not be for their best interest and welfare, and we agree that it might well produce scars upon their minds and hearts which time could never efface.

Having reached this conclusion we would ordinarily not consider other assignments of error by either Clifford or Woodford, but since a considerable portion of the briefs were devoted to other questions to which counsel desire an answer, we will consider them.

Woodford assigns as error on his cross-appeal the inclusion of the following statement of the trial judge in his order and judgment of May 7, 1957:

"Nothing herein in any way reflects adversely upon the character, the morals or the fine home and family of Mr. and Mrs. Clifford."

Woodford contends that the evidence shows Clifford to be unfit to assume the responsibilities of parenthood. Clifford contends that the court completely disregarded this statement (which he designates as a finding) in awarding custody of the children to Woodford. We agree with the view that the conduct of Clifford toward his children from their infancy to the date of trial evidences but little, if any, love or affection for them and a minimum of interest in them, but we see no prejudicial error in the above statement of the trial judge. There is nothing in the evidence that reflects upon his home or indicates that it is not a comfortable home. He is not shown to be immoral as the term is generally used, and certainly there is nothing to indicate that Charlotte, his wife, is not a lovely lady. On the other hand, we do not ascribe to it the importance given to it by Clifford. Neither do we agree that there is any conflict between said statement and the order awarding custody of the children to Woodford. It was undoubtedly his relationship with these children over the years that formed the basis upon which the court's order and judgment rests.

We think there is no merit to Woodford's contention on his cross-appeal that the court erred in not quashing Clifford's writ of habeas corpus during the course of the proceedings. It is our view that the trial court was fully justified in denying Woodford's motion to quash. The court did quash the writ in its final order and judgment. Woodford suffered no prejudice whatever by reason of the court withholding its ruling thereon until the conclusion of the case. Each of the causes consolidated had for its purpose the custody of the same children. If, as claimed by Clifford, the habeas corpus was limited in its operation to procuring the liberty of the children from unlawful restraint, it was important that the cases be consolidated and that the court consider all of the evidence in both cases in reaching its conclusion and pronouncing judgment thereon. However, the case of Fladung v. Sanford, supra, held contrary to Clifford's contention. Nevertheless, no one suffered harm as a result of their consolidation.

Certainly there is no merit to Woodford's contention that the court erred in refusing to consolidate cause No. 37886 with the other cases or with either of them. That cause of action was instituted by the mother to have Woodford appointed guardian of her children. It was instituted, of course, during her lifetime and while the

Superior Court of Graham County still had exclusive jurisdiction over the custody of the children under the divorce decree by virtue of section 27–811, A.C.A.1939, now A.R.S. section 25–321. Custody of the children could only be changed during her lifetime by a modification of the decree of divorce by the Graham County court, and then only if a change in the circumstances surrounding such children which was detrimental to their welfare were shown. Not until the death of the mother was the Graham County Superior Court divested of such jurisdiction. Woodford v. Superior Court, supra. The trial court, therefore, properly denied Woodford's motion to consolidate said cause with causes No. 38944 and No. 93392.

We believe the court was in error in incorporating in its order and judgment a provision reserving jurisdiction in the court to make such other and further orders with reference to the custody of said children as the court may deem appropriate. We are of the view that in the absence of statutory authority in guardianship matters the court is without power to retain jurisdiction of the children and to reopen this case for change of custody, either temporary or permanent. However, we think there is no doubt that, if conditions change, in a new proceeding upon a showing that the best interest and welfare of the children would not be subserved by Woodford's further custody of them the court would then do as it did in this case, place their custody elsewhere. Fladung v. Sanford, supra, and In re Winn, supra. These cases both decide this may be done.

It would profit us nothing to discuss the effect of intermediate orders made by the trial court during the course of the proceedings. It is the result at which Clifford's appeal is directed. We therefore hold that the trial court was justified in deciding that it would be for the best interest and welfare of these children to permit them to remain in the custody of Woodford, but that the court does not retain jurisdiction over said children for any purpose.

Judgment affirmed as above modified.

WINDES and STRUCKMEYER, JJ., concur.

JOHNSON, Justice, with whom UDALL, Chief Justice, concurs (dissenting).

We dissent from the majority opinion for the reason that it is our view the established law in child custody cases as enunciated by this court in several previous decisions is being misconstrued to justify the conclusion reached; furthermore, the facts recited, particularly the previous relationship between Clifford and his children, are likewise being strained to serve the same end.

Samuel K. Clifford and Constance V. Brooks were married at Safford, Arizona, on May 3, 1942. Two children were born

as issue, namely, Jacqueline Clifford, born May 30, 1943, and Marrie Gretchen Clifford, born August 8, 1945. Clifford was in the military service at the time of his marriage and remained in such service until June of 1947. On February 2, 1946, a divorce was granted and Constance V. Clifford was awarded the care and custody of the two minor children.

In October, 1946, Constance V. Clifford married R. Reid Woodford, and two children have been born as issue. Soon after the marriage they moved to Tucson, Arizona, where they lived until 1950 and finally moved to Phoenix, Arizona.

In August, 1946, Samuel K. Clifford married Charlotte Lindsay and three children have been born as issue.

After the untimely death of Constance V. Woodford on November 4, 1956, this matter was before this court in the case of Woodford v. Superior Court, 82 Ariz. 181, 309 P.2d 973, resulting from a purported modification of the divorce decree, transferring the legal custody of the two minor children after the death of Mrs. Woodford, to Clifford. The late Justice LaPrade, speaking for a unanimous court, held that upon the death of a party who holds legal custody pursuant to a divorce decree, the right of legal custody automatically inures to the surviving parent, and that such custody continues until it is shown that such survivor is unfit to assume the responsibilities inherent to parenthood.

We also held in the recent case of Arizona State Department of Public Welfare v. Barlow, 80 Ariz. 249, 296 P.2d 298, 300:

"* * * Because the child has attained a favored, beneficent status in our social and legal systems does not detract from the well-settled rule that the right of parents to the custody of minor children is both a natural and a legal right. Harper v. Tipple, 21 Ariz. 41, 184 P. 1005; In re Winn, 48 Ariz. 529, 63 P.2d 198. * * * that 'no court can, for any but the gravest reasons, transfer a child from its natural parent to any other person'."

It has long been the settled law in this state that the party seeking to deprive or withhold a child from its natural parents must affirmatively establish the incompetency and delinquency of the parent as an unfit person to have the custody of the child and further so establish that it is not for the best interest and welfare of the child for the parent to retain custody. Arizona State Department of Public Welfare v. Barlow, supra; and Harper v. Tipple, supra.

The appellant, the natural father of the children, contends that the finding made by the trial court wherein it stated

"Nothing herein in any way reflects adversely upon the character, the morals or the fine home and family of Mr. and Mrs. Clifford."

is a finding that appellant is not an unfit person to have the custody and control of his minor children; and that before the court can deprive the natural father of his right to the children's custody and give them to a stranger, there must be a finding that the father is an unfit person to have the custody of his children. We agree with this contention. The right of a parent to the care and custody of a child cannot be taken away merely because the court (either trial or appellate) may believe that some third person can give the child better care and greater protection. One of the natural rights incident to parenthood, a right supported by law and sound public policy, is the right to care and custody of a minor child, and this right can only be taken away from or denied a parent upon proof that the parent is unfit to have such care and custody. Ex parte White, 54 Cal.App.2d 637, 129 P.2d 706; Arizona State Department of Public Welfare v. Barlow, supra, and Harper v. Tipple, supra.

The majority opinion holds that Woodford has to only show by a *preponderance of the evidence* that Clifford is not a fit person to have the custody of his children. We do not believe that this is a correct statement of the law under the general rule or the decided cases of this state. We believe that the burden of proof on a third person seeking to deprive a parent of his children is much greater than a mere preponderance of the evidence.

The rule is well stated in a recent case of State ex rel. Nelson v. Whaley, 246 Minn. 535, 75 N.W.2d 786, 792, wherein the court said:

"* * * In order to justify depriving a parent of the custody of a child in favor of third persons there must be a grave reason growing out of neglect, abandonment, incapacity, moral delinquency, instability of character, or inability to furnish the child with needed care. The reasons must be 'real, cogent, weighty, strong, powerful, serious, or grave.' 67 C.J.S. Parent and Child § 12."

and in the case of In re Sweet, Okl., 317 P.2d 231, 235 it was said:

"* * * it is presumed, in the absence of a *strong and clear showing* to the contrary, that their best interests are served by letting them remain with their parents.

* * * * * *

"* * * To justify the courts in depriving parents of the care and custody of their own children, the parents' special unfitness must be shown by evidence that is *clear and conclusive* and sufficient to make it appear that the necessity for doing so is imperative." (Emphasis supplied.)

To the same effect is the holding in the case of In re Smith's Guardianship, 147 Cal.App.2d 686, 306 P.2d 86, 91, wherein

that court said "The burden on the one claiming unfitness of a parent is a heavy one."

This court, in Harper v. Tipple, supra [21 Ariz. 41, 184 P. 1007], decided many years ago that the natural right of the parent to the custody and care of his child should not be invaded except upon a *clear showing* of delinquency on the part of the parent, and to use the language of the court in that case:

"* * * The breaking of the ties that bind father and child to each other can never be justified without the most *solemn and substantial reasons,* established by plain proof. In any form of proceeding the sundering of such ties should always be approached by the courts 'with great caution and with a deep sense of responsibility.' * * *" (Emphasis supplied.)

In the very recent Barlow case, supra, we cited with approval the case of Hale v. Henderson, 210 Ga. 273, 79 S.E.2d 804, which holds that the burden of proof in such cases is by clear and strong proof; we also in the Barlow case approved the decision in Ex parte De Castro, 238 Mo. App. 1011, 190 S.W.2d 949, 959, wherein that court used this language:

"* * * in a contest between the parent and some third person, is not to be denied the parent unless it is made manifest to the court that the parent, for some *strong and cogent* reason,

is unfit or incompetent to have his child, so that the welfare of the child itself demands a different disposition." (Emphasis supplied.)

We are, therefore, committed to the rule that the burden of proof in cases where a third person is seeking to deprive a parent of his children is much greater than a mere preponderance of the evidence, and requires a higher degree of proof. It must be such proof that is clear, conclusive, strong, cogent and grave.

The appellee, in an attempt to prove that the natural father was an unfit person to have the custody of the minor children and to establish his own fitness, which was never disputed, called thirty-four witnesses in a hearing that lasted six days, and with over seven hundred pages of testimony there is not one word uttered by any witness that is detrimental or damaging to the character or reputation of the natural father or his present wife or their present home. These facts alone must have prompted the trial court to make the finding that in refusing to give the children to the natural parent, it in no way reflected adversely upon the character, the morals or the fine home and family of Mr. and Clifford. This is not a finding or unfitness of Mr. Clifford.

In the case of Harper v. Tipple, supra, we held that the evidence must be considered in the light of the rule that it will be assumed that a father is competent to

272

have the care and custody of his child, in the absence of any affirmative showing to the contrary, and the law further presumes, until otherwise shown, that it is to the best interest and welfare of children to be in the custody of their parent. 67 C.J.S. Parent and Child § 12.

With these rules in mind, what does the evidence show? That at the time of the divorce of Constance Brooks Clifford in February, 1946, Clifford signed a waiver of appearance, consenting and agreeing to pay the sum of $150 per month for the support of his daughters, and this amount was paid at all times with the exception of three or four months when Clifford reduced it to sixty dollars per month for the reason that after his discharge from the service as an officer in the Air Force his income was less. In any event, in March, 1948, he had paid his former wife the full amount ordered by the judgment of divorce, and at that time his former wife agreed that the court could order a reduction in the amount of support to the sum of seventy-five dollars per month. This amount was paid from 1948 until the death of Mrs. Woodford in 1956, with the exception that two payments were delinquent at that time and were later refused by appellee. Can the appellant be deemed an unfit father where for a period of over ten years he paid the monthly support payments in the amounts agreed to by his former wife and as fixed by the courts? We do not be-

lieve that a father who has complied with a court order in the payments for the support of his minor children, even though at times he became in arrears, should be deprived of his children and declared to be unfit to have their custody.

As we read the record before the trial court it shows that from the time of Clifford's discharge from the military service to the present time he has always been interested in his children and visited with them whenever possible. While there is some conflict in the evidence concerning his visiting with the children from the time of his divorce in February, 1946, until his marriage to his present wife in August 1946, *it must be remembered that his fitness to have the custody of his children must be determined as of the time of the hearing of the petition for guardianship.* McVey v. Chester, Okl., 288 P.2d 740; Guardianship of Willis, 123 Cal.App.2d 446, 266 P.2d 944; In re McCoy's Guardianship, 46 Cal.App.2d 494, 116 P.2d 103.

The evidence shows that Clifford was in the military service from 1941 until his discharge in June, 1947, and he resided in Safford, Arizona, from his discharge until the spring of 1951, when he moved with his family to Colorado to enter the cattle business. Clifford testified that from the time of his divorce until the marriage to his present wife that he was not in Safford, and hence could not readily visit his children.

After his discharge in 1947 and until 1951, while residing in Safford, Arizona, Clifford would see his children at least two or three times a month. He took pictures of his children on twelve different occasions, which were introduced in evidence, including about three hundred feet of motion pictures, when they visited with him. That on at least twelve other occasions they visited with him at his home in Safford during this period. It was during these visits that Charlotte became acquainted with the children and learned to love them. There is little doubt that the children loved their father during this time as the record shows:

"Q. Will you [Charlotte] describe to the Court the reaction as you saw it grow and develop as they visited in your home?

"A. They [the children] were always delighted to see Kemp, it was a time of excitement I believe. Little girls like to be pretty for their father and they enjoyed showing off their best talents for him and open affection."

In 1952 the two children visited with their father and his wife, Charlotte, in Colorado, and remained with them for two months. During this time they became part of the family, attended church, took part in social functions and parties. The two-months visit can be best described by Gretchen's own words "We had a wonderful time", and by Jacqueline when she said she had pleasant memories of the time spent in her father's home in Colorado.

Both Clifford and his wife, Charlotte, testified that Clifford always sent Christmas gifts to the children; however, it appears that it was the custom of the Clifford family not to remember each other with gifts for birthdays, but to observe it with a dinner or birthday cake. This explains why the children were not remembered by birthday gifts.

Since the death of Mrs. Woodford in November, 1956, Mr. Woodford has necessarily employed housekeepers to operate his home and care for the children. One housekeeper remained about five months and the second housekeeper, at the time of the trial, had been there about six weeks.

The record shows that Woodford's care of the children for many years was excellent and he deserves unstinted praise for his treatment of children not his own; nevertheless, he is, legally speaking, a "stranger" to the family. But can it be said that it is for the best interest and welfare of these children to remain in a home where only a housekeeper is in charge? Or would it be for their best interest and welfare to be in a home with the natural father and a loving stepmother, and have all the advantages of a normal home?

The evidence shows without contradiction that the present Mrs. Clifford is a woman of very high character, that she graduated from college and had classes in child psychology and family relations. The evidence further shows that Mrs. Clifford is an outstanding mother and housekeeper, that she has special talents as a seamstress and decorator, that she can and does give piano lessons, and that the family regularly attend religious services and provide religious training in the home.

It certainly requires very little imagination to understand that the children would be better cared for in all respects in a home with their own father and a woman who sincerely loves them and wants the privilege of giving them the love and care they need and require.

By the majority opinion Clifford is "branded" as an unfit father to have the custody of these children. This finding of unfitness necessarily implies that Clifford is unfit to have the custody of and care for his other children, a cruel implication that is not supported by the record. As a matter of fact, the record shows without contradiction that Clifford's relationship with his wife and present children is one of great affection and mutual love.

We do not believe that the appellee Woodford carried the burden of proof with sufficient evidence to make a clear, conclusive and strong showing of delinquency and unfitness on the part of Clifford, and that the evidence did not establish by plain proof any solemn or substantial reasons to deprive the father of the care and custody of these children.

It is, therefore, our considered opinion that the trial court was not justified, and abused his discretionary powers, in issuing letters of guardianship to appellee and in quashing the writ of habeas corpus. We would reverse the judgment of the lower court with directions to grant custody to the natural father.